ATTORNEY FOR APPELLANT
Matthew Jon McGovern
Evansville, Indiana

ATTORNEYS FOR APPELLEE
Steve Carter
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana



FILED
May 15 2008, 11:13 am
CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 31S00-0610-CR-355

HOBERT ALAN PITTMAN,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Harrison Superior Court, No. 31D01-0406-MR-481
The Honorable Roger D. Davis, Judge

On Direct Appeal

**May 15, 2008**

**Boehm, Justice.**

The defendant, known as "Albert" Pittman, was found guilty by a jury of two counts of felony murder, and one count each of attempted murder, theft, auto theft, and conspiracy to commit burglary. The jury found that Pittman intentionally killed each of the murder victims and recommended a sentence of life without parole on each of the murder counts. The trial court sentenced Pittman to two consecutive life sentences for the murders plus consecutive sentences on the other counts aggregating seventy-three years. We find that the evidence does not support one of the life without parole sentences and remand with instructions to enter a consecutive sen-

tence of sixty-five years on that count.  We otherwise affirm Pittman's convictions and sentences.

## Facts and Procedural History

The defendant, Albert Pittman, is the son of Hobert Pittman and the stepson of Linda Pittman.[1]  In the spring of 2004, Hobert and Linda lived together in the Ohio River town of Mauckport, Indiana, along with Linda's mother, Myrtle Satterfield.  Myrtle was in her eighties and suffered from a medical condition that had required amputation of both legs.  To transport Myrtle, Hobert and Linda had purchased a wheelchair-accessible van.  They also owned two pick-up trucks and a Ford Explorer.

Although Myrtle owned a house in adjacent Crawford County, she was unable to live alone, and Hobert and Linda were helping to prepare the house to be rented.  On Saturday, June 12, 2004—Hobert and Linda's thirteenth wedding anniversary—Hobert, Linda, and Myrtle all worked at the Crawford County property.  At some point, Hobert left for home in his truck, but Linda and Myrtle remained for a few hours and returned to Mauckport late in the afternoon in the van.

When Linda and Myrtle arrived at the home, they found the security gate open and Hobert's truck parked at an unusual angle.  As the van stopped in the driveway, Pittman emerged from the garage on the driver's side of the van and fired shots into the van.  Pittman then got into Linda's Explorer, drove past the van, and stopped.  Pittman and another man emerged from the Explorer and both resumed shooting into the van.  Linda screamed, then stopped breathing and tried to appear dead in the driver's seat.  Pittman and the man then drove away in the Explorer.

Despite having sustained severe injuries, Linda drove for help with Myrtle still in her wheelchair in the van.  Linda identified the Explorer ahead of her turning left toward the Ohio River.  She saw the Explorer's backup lights come on, thought the Explorer was coming after her, and turned right into the parking lot of a tavern where she was able to flag down a passing truck.  Linda told Darrell Mosier and Matthew Stanley that Pittman had shot her and her family

---

[1] The defendant's legal name is Hobert Alan Pittman, but he is known as Albert Pittman.  This opinion will refer to the defendant as "Pittman" and to his father as "Hobert."

2

and had driven away in an Explorer. At that point, Mosier and Stanley saw an Explorer approach, execute a U-turn, and head back toward the Ohio River. Stanley remained with Linda and called 911 while Mosier followed the Explorer in his truck. From a height above the river, Mosier saw the Explorer stop under a bridge where two men transferred items from the Explorer to a Plymouth Horizon that had been parked under the bridge, and then drove the Horizon over the bridge into Kentucky.

Myrtle was found dead in the van. An autopsy concluded that she had died of shotgun blasts to her head and shoulder. Linda sustained shotgun wounds to her chest and lost a thumb, but survived. Examination of the van revealed bullet fragments and shotgun pellets and wadding. The front windshield and rear driver's side window had bullet holes, and the windows on the driver's side had holes consistent with shotgun fire.

At the home, officers found Hobert under a tarp in the garage, dead from a wound to the head that could have been inflicted by either a shotgun or a rifle. Empty shotgun and rifle shells were found in the driveway. Portions of the home had been ransacked, a window was broken, and Hobert's gun cabinet had been emptied. A search of the Ford Explorer abandoned at the bridge turned up seventeen long guns, at least four of which were Hobert's. Tests determined that the bullet fragments and shotgun shells recovered at the crime scene had been fired from two of the weapons recovered from the Explorer. No useful fingerprints were found on either weapon.

Two days after the shootings, Pittman's mother reported to law enforcement that she had received a phone call from Pittman. Pittman told his mother that he was not involved in the shootings and was sleeping in a park when they occurred, but had heard of the murders on his scanner radio. Law enforcement determined that the call came from a pay phone in Daytona Beach, Florida. Daytona Beach police soon located and arrested Pittman and John Michael Naylor and seized a Plymouth Horizon. The men were transported back to Indiana along with evidence found in the Horizon, including firearms and survival gear. No scanner was found among the items removed from the vehicle. While incarcerated in Indiana, Naylor requested to speak with a correctional officer and stated, "I'm guilty of killing those two people and need to talk to someone over the situation."

3

Pittman was charged with theft, auto theft, conspiracy to commit burglary, attempted murder of Linda, and two counts of felony murder alleging that Hobert and Myrtle were killed in the course of a burglary. The State also filed a request for life imprisonment without parole, alleging three aggravating circumstances as to each murder: that Pittman had intentionally killed each victim in the course of the burglary, that he did so by lying in wait, and that the murders occurred while Pittman was on probation. The jury found Pittman guilty on all counts, determined the existence of statutory aggravators, decided that the aggravators outweighed any mitigating circumstances, and recommended two sentences of life imprisonment without parole. The trial court sentenced Pittman to concurrent terms of twenty years for the conspiracy to commit burglary and three years for theft, followed by consecutive sentences of life without parole for each of the two murders, fifty years for attempted murder, and three years for auto theft.

Pittman appeals his convictions and sentences. Because the trial court imposed life without parole, this Court has mandatory jurisdiction of this direct appeal under Indiana Rule of Appellate Procedure 4(A)(1)(a). Pittman's appeal raises five issues:

I. Whether a sentencing order imposing life imprisonment without parole under the current life without parole statute must comply with the heightened requirements of Harrison v. State;

II. Whether the trial court abused its discretion in denying a mistrial after testimony that Pittman and his co-conspirator met in prison;

III. Whether the trial court erred in admitting into evidence a photograph of the victims during life;

IV. Whether the trial court improperly imposed a sentence of life without parole on a theory of accomplice liability; and

V. Whether the trial court improperly imposed consecutive sentences.

## I. Adequacy of the Sentencing Order

Pittman argues that his sentences of life without parole are erroneous because the trial court's written sentencing order does not satisfy the requirements set out in Harrison v. State, 644 N.E.2d 1243, 1262 (Ind. 1995), for an order sentencing a defendant to life without parole or death.

4

A sentence of life without parole requires findings that (1) the State proved at least one aggravating circumstance beyond a reasonable doubt and (2) the aggravating circumstances outweigh any mitigating circumstances. Ind. Code § 35-50-2-9 (2004). Before 2002, if the defendant was convicted in a jury trial, the jury made the findings and recommended a sentence of life without parole to the judge. The judge then considered, but was not bound by, the jury's recommendation, and the judge made the final determination. Ind. Code Ann. § 35-50-2-9(d)–(e) (West 1998). If the defendant was convicted in a bench trial or if the jury was unable to agree on a recommendation, the judge made the findings and final sentencing determination. Id. § 35-50-2-9(d), (f), (g). In either event, under the pre-2002 statute "the sentencing court [had] a separate and independent role in assessing and weighing the aggravating and mitigating circumstances and in making the final determination whether to impose [a sentence]." Harrison, 644 N.E.2d at 1261.

In Harrison, we interpreted the life without parole statute as requiring the trial court's sentencing order to (1) identify each mitigating and aggravating circumstance found; (2) include the specific facts and reasons which led the court to find the existence of each circumstance; (3) articulate that the mitigating and aggravating circumstances have been evaluated and balanced in determination of the sentence; and (4) set forth the trial court's personal conclusion that the sentence was appropriate punishment for the offender and crime. 644 N.E.2d at 1262 (citing Benirschke v. State, 577 N.E.2d 576, 579 (Ind. 1991); Evans v. State, 563 N.E.2d 1251, 1254 (Ind. 1990)).

In 2002, the General Assembly amended the statute governing sentencing in life without parole and death penalty cases. This amended statute applies to Pittman, whose crime was committed in 2004. Under the amended statute, the trial court no longer makes the final sentencing determination in all cases. If the defendant is convicted in a jury trial, a sentence of life without parole requires the jury's recommendation. To recommend life without parole, the jury must (1) find at least one aggravating circumstance proven beyond a reasonable doubt, (2) provide a special verdict form for each aggravating circumstance alleged, and (3) find that the aggravating circumstances outweigh any mitigating circumstances. I.C. § 35-50-2-9(d), (e), (*l*) (2004). If the jury makes a sentencing recommendation, the court is to sentence the defendant "accordingly." Id. § 35-50-2-9(e). The trial court is to determine the final sentence only if the

defendant enters a guilty plea or is convicted in a bench trial, or the jury cannot agree on a recommendation. Id. § 35-50-2-9(d), (f).

The amended statute altered the relative roles of judge and jury. Laux v. State, 821 N.E.2d 816, 821 (Ind. 2005). We have not previously addressed the effect, if any, of these changes on the Harrison requirements for sentencing orders. Id. For the reasons explained below, we conclude that under the current statute sentencing orders imposing the death penalty or life imprisonment without parole must comply with Harrison's requirements only when the trial court sentences without a jury's findings and recommendation. We require more detailed orders in these cases

> to insure the trial court considered only proper matters when imposing sentence, thus safeguarding against the imposition of sentences which are arbitrary or capricious, and to enable the appellate court to determine the reasonableness of the sentence imposed.

Harrison, 644 N.E.2d at 1262 (citing Daniels v. State, 561 N.E.2d 487, 491 (Ind. 1990)).

The sentencing process under the current statute introduces two qualitatively different processes. First, the jury must find an aggravating circumstance beyond a reasonable doubt. This is a traditional fact-finding exercise that is subject to the usual provisions in Trial Rules 50 and 59 permitting judges to set aside jury verdicts as not supported by the evidence or otherwise defective. The second component of a sentence under the statute is the determination whether the aggravating circumstances outweigh the mitigating circumstances. We have held that this finding is not a factual determination and is not susceptible to evaluation under the reasonable doubt standard. Ritchie v. State, 809 N.E.2d 258, 268 (Ind. 2004). Rather, it is essentially a discretionary function as to which the jury has considerable leeway.

If the jury makes a recommendation, the extent to which the judge is bound by that recommendation has not been fully resolved. See Kubsch v. State, 866 N.E.2d 726, 739 (Ind. 2007). We believe that the statutory directive to "sentence the defendant accordingly" is intended to direct the trial court to impose the sentence recommended by the jury except where the traditional allocation of functions between judge and jury authorize or require the judge to set aside the jury's findings. The trial court is obligated to follow the jury's recommendation unless (1) the recommendation is based on a statutory aggravator that is not supported by sufficient evidence; (2) there is error in the course of the trial that requires grant of a Motion to Correct Error

or Motion for New Trial; or (3) the trial court exercises its role as the "thirteenth juror" to set aside the sentence and order a new sentencing phase.

There are, however, circumstances in which the trial judge exercises discretion over the sentence imposed. This occurs when judgment was entered on a guilty plea or after a bench trial, or when the court assumes control of sentencing after a jury is unable to agree on a recommendation after reasonable deliberation. Similarly, if the jury finds several aggravators, one or more of which is not supported by sufficient evidence, the trial court may balance the remaining aggravators and determine whether to impose a sentence of life without parole or a term of years. In these circumstances the role of the trial judge is similar to the judge's role under the pre-2002 statute. Accordingly, the trial court's sentencing order must comply with <u>Harrison</u> in all these cases. A trial court may also exercise its traditional Trial Rule 50 and 59(J)(7) functions to find that there is insufficient evidence for a jury to find one or more aggravators. But those rules already impose requirements as to findings and reasons, and no additional judicial requirement is needed.

When a jury makes the final sentencing determination, a <u>Harrison</u>-style order would be out of place. Juries are traditionally not required to provide reasons for their determinations. Any reasoning provided by a trial court's order would necessarily be that of the trial judge, not the jury. Because the final decision belonged to the jury, this reasoning would be unhelpful on appeal and could undermine confidence in the jury's determination. We think it is enough that by entering the sentence recommended by the jury, the trial court has made an independent determination according to the trial rules that there is sufficient evidence to support the jury's decision.

## II. Motion for Mistrial

Prior to trial, Pittman filed a motion in limine to exclude all testimony related to his "prior arrests or convictions." Defense counsel raised the concern that deposition testimony had revealed that Pittman and Naylor had met while both were incarcerated. At the pretrial hearing, the trial court observed that

> any gratuitous references, or volunteered information in nonresponse to questions
> is going to cause a problem. . . . So I'm sure that the State and the defense attor-

7

neys are going to tell all the witnesses that they can leave all the gratuitous, irrelevant comments at home. . . . They basically need to answer the questions asked and not volunteer anything else that's obviously not appropriate.

The trial court ordered all litigants and witnesses to "refrain from stating or alluding to any arrests or convictions of the Defendant without first obtaining permission of the Court outside the presence and hearing of the jury."

At trial, the State called Andrew Naylor, John Michael Naylor's brother, as a witness, and the following dialogue ensued.

Q [by the State]: All right. Mr. Naylor, do you know a man by the name of Albert Pittman?
A: Yes.
Q: How do you know him?
A: Through my brother.
Q: Okay. When did you first meet him?
A. In, I think it was 2003, in the summer.
Q: Where was that at?
A: Uh . . . We met him at the Walmart over here in Corydon.
Q: Okay. Now you say we met him, who are you referring to?
A: Me and my brother.
Q: Okay. Was he a friend of your brother's?
A: Uh . . . He . . . he was someone that he knew from prison.

The defense immediately moved for a mistrial, and the trial court dismissed the jury. After questioning Andrew Naylor, the trial court was satisfied that the prosecution did not deliberately elicit a reference to Pittman's incarceration. After hearing argument and reviewing case law, the trial court denied the motion for a mistrial and instead ordered the jury to "disregard" the "last answer to the last question that the witness gave."

Pittman argues that the trial court abused its discretion in denying his motion for a mistrial. Alternatively, Pittman argues that the State's conduct shows a deliberate attempt to prejudice him because the State did not advise Andrew Naylor of the motion in limine and used the same line of questions that had produced the prohibited answer during Andrew Naylor's deposition.

We review a trial court's decision to deny a mistrial for abuse of discretion because the trial court is in "the best position to gauge the surrounding circumstances of an event and its impact on the jury." McManus v. State, 814 N.E.2d 253, 260 (Ind. 2004). A mistrial is appropriate

8

only when the questioned conduct is "so prejudicial and inflammatory that [the defendant] was placed in a position of grave peril to which he should not have been subjected." Mickens v. State, 742 N.E.2d 927, 929 (Ind. 2001) (quoting Gregory v. State, 540 N.E.2d 585, 589 (Ind. 1989)). The gravity of the peril is measured by the conduct's probable persuasive effect on the jury. Id.

We agree that Andrew's disclosure was unfortunate, particularly given the State's failure to advise him of the motion in limine. Nevertheless, the trial court did not abuse its discretion in denying Pittman's motion for a mistrial. Innocent violation of a motion in limine does not automatically warrant a mistrial. E.g., Bradley v. State, 649 N.E.2d 100 (Ind. 1995) (admonishment effective when witness testified as to names excluded by motion in limine); Williams v. State, 270 Ind. 573, 387 N.E.2d 1317 (1979) (mistrial not required when witness gave nonresponsive answer connecting defendant with individual excluded by motion in limine). Given the evidence presented against Pittman, we think it highly unlikely that Andrew Naylor's implicit reference to Pittman's prior incarceration had any significant effect on the jury.

### III. Admission of Photographic Evidence

Pittman argues that the trial court erred in admitting into evidence a photograph of Myrtle, Linda, and Hobert on Myrtle's eightieth birthday. The photograph shows Myrtle holding a bouquet of roses given to her by Hobert, and all three are dressed for the birthday celebration. The State introduced the photograph after Linda's description and explanation of the photograph, during which she predictably sobbed. The State rested its case the following morning immediately after passing the photograph to the jury.

Pittman argues that the State introduced the photograph as victim-impact evidence designed to play to the jury's sympathy. The State responds that the photograph is relevant in two ways. It shows that Myrtle was alive before the killing. It also depicts a close family, suggesting that Hobert was murdered first because he did not come to Myrtle's and Linda's aid.

All relevant evidence is generally admissible. Ind. Evidence Rule 401. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Id. The picture of a victim taken during life is technically relevant to establishing

9

that the victim was alive before the alleged killing. Humphrey v. State, 680 N.E.2d 836, 842 (Ind. 1997) (citing Butler v. State, 647 N.E.2d 631, 633–34 (Ind. 1995)). But that fact is rarely contested and usually easily established by less dramatic evidence. Here, Linda's account described Myrtle and Hobert as living on the day of the murders. In any event, the depiction of surviving family members may or may not be relevant, and "smacks of victim impact evidence and is to be discouraged due to its possible emotional impact on the jury." Id. The State's other justification is of marginal value at best. The sequence of killings is not an issue, but if it were, Linda's account makes clear that Hobert was the first victim.

Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Evid. R. 403. When this photograph was introduced, the jury had already seen gruesome photographs of the victims' injuries. Juxtaposing those photographs with a picture of the victims healthy and celebrating created a prejudicial emotional impact that outweighed the picture's probative value. Its admission was therefore error, but, in light of the other evidence presented against Pittman, the photograph's admission was harmless error that did not affect his substantial rights. Ind. Trial Rule 61; see also Littler v. State, 871 N.E.2d 276, 278 (Ind. 2007) (citations omitted).

Pittman also contends that the trial court abused its discretion by allowing Linda to wear this same photograph as a lapel pin during the trial. The pin displayed the picture in an opaque holder and measured approximately two and one-eighth inches by three and one-half inches. The trial court considered the size of the pin, the low quality of the photograph, that Linda would sit during trial on the side of the courtroom opposite the jury, and that the jury would already see Linda as a live witness during the trial. The trial court concluded that the pin was not prejudicial. "Judges require broad latitude to run their courtrooms and to maintain discipline and control." Brown v. State, 746 N.E.2d 63, 70–71 (Ind. 2001) (citing Timberlake v. State, 690 N.E.2d 243, 256 (Ind. 1997)). The trial court was within this range of discretion.

## IV. Life Without Parole and Accomplice Liability

The State sought sentences of life without parole for the murders of Hobert and Myrtle. To support its request, the State charged three aggravating circumstances listed in Indiana Code section 35-50-2-9(b). These are that Pittman committed the murders by intentionally killing

10

while committing or attempting to commit burglary (subsection (b)(1)), committed the murders by lying in wait (subsection (b)(3)), and committed the murders while on probation after receiving a sentence for a commission of a felony (subsection (b)(9)). As to Myrtle, the jury found all three aggravators proved beyond a reasonable doubt. As to Hobert, the jury found the (b)(1) and (b)(9) aggravators proved beyond a reasonable doubt, but did not find that Pittman committed the murder by lying in wait. Pittman raises several challenges to these findings.

### A. *The Instruction*

Pittman argues that the jury instructions for the first aggravator found by the jury—that he intentionally killed while committing or attempting to commit burglary—improperly incorporated a theory of accomplice liability. The trial court instructed the jury that to consider recommending a sentence of life without parole for the murders of Hobert or Myrtle, it must unanimously find that Pittman "by acting alone or in concert with John Michael Naylor, did intentionally kill another human being, while committing or attempting to commit burglary." Pittman contends that this instruction was phrased in such a way that the jury may have improperly imputed Naylor's intent to Pittman. Pittman concedes that he did not raise this issue at trial but argues that we may consider it as fundamental error even though it was not preserved for appeal. We see no merit in this claim. The allegation that Pittman intentionally killed, either alone or in concert with Naylor, does not suggest that Naylor's intent could be imputed to Pittman. Even if improvement in the language is possible, that certainly does not rise to the level of fundamental error. See Brown v. State, 799 N.E.2d 1064, 1066–67 (Ind. 2003) ("To constitute fundamental error, the error must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process.") (citation and internal quotations omitted).

### B. *Sufficiency of the Evidence*

Pittman also contends that the State did not present sufficient evidence to prove that Pittman intentionally killed Hobert or Myrtle. The Supreme Court of the United States has held that the Eighth Amendment requires a showing of the defendant's major participation in a crime and reckless indifference to human life before imposing a death sentence. Tison v. Arizona, 481 U.S. 137, 157–58 (1987). Because Indiana's death penalty statute applies equally to life without

parole sentences, we have held that Tison also applies to life without parole sentences. Ajabu v. State, 693 N.E.2d 921, 937 (Ind. 1998). Additionally, because Indiana Code section 35-50-2-9(b)(1) permits a sentence of life without parole only if the defendant has committed a murder by "intentionally" killing a victim while committing another crime, the State must prove that the defendant was a major participant in the killing and the killing was intentional in order to impose a sentence of life without parole under subsection (b)(1). Id. at 939.

"A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a) (2004). In Ajabu, we found that the State did not establish that the defendant had intentionally killed even though he helped plan and substantially participated in the crimes leading to the murders, was present and armed with a loaded weapon when violence escalated, and was aware of the high probability of a victim's death at the hands of an accomplice. Ajabu, 693 N.E.2d at 939.

Pittman's argument is in substance a claim that the evidence is insufficient to support a finding of the (b)(1) aggravator. We disagree as to Myrtle and find that the State presented sufficient evidence for the jury to find that Pittman intentionally killed Myrtle. Linda testified that when she pulled the van into her driveway, Pittman emerged from the garage and began shooting into the occupied van from a "very close range." After getting into the Explorer and driving past the van, Pittman got out of the Explorer and fired additional shots into the van. Only after Linda played dead did Pittman return to the Explorer and leave the scene. These facts are sufficient to allow a jury to find that Pittman intentionally killed Myrtle either alone or in concert with Naylor.

Hobert's killing presents a different picture. There is no evidence that Pittman killed Hobert, who died from a single wound. An expert testified that he could not determine what type of firearm was used. There is clear evidence that both Pittman and Naylor were at the scene, but no evidence as to who shot Hobert, even assuming one of the pair did. We agree that the State has not established beyond a reasonable doubt that Pittman killed Hobert. Imposition of life without parole based on this aggravator is therefore not permitted under Indiana law.

12

C. *Life Without Parole and Felony Murder*

"Felony murder" is a term usually used to describe a crime punishable as murder under Indiana Code subsections 35-42-1-1(2) and (3) but where the defendant did not necessarily intentionally or even recklessly kill the victim, or may not have been the killer at all. E.g., Palmer v. State, 704 N.E.2d 124 (Ind. 1999) (affirming felony murder conviction for death of accomplice when law enforcement officer killed the accomplice during course of kidnapping). The deaths of both Myrtle and Hobert were charged as felony murders defined in section 35-42-1-1(2). That crime requires no proof of mens rea other than that required for the underlying crime, in this case burglary. Palmer, 704 N.E.2d at 127 (citing Vance v. State, 620 N.E.2d 687, 690 (Ind. 1993)). A sentence of death or life without parole under the (b)(1) aggravator requires a further showing that the defendant intentionally killed the victim. As explained above, this was proved as to Myrtle but not as to Hobert. Because an intentional killing is "murder" under both 35-42-1-1(1) and, if committed in the course of a burglary, also under 35-42-1-1(2), Pittman's conviction of felony murder with the additional finding of the (b)(1) aggravator supports life without parole as to the murder of Myrtle.

Hobert's murder presents a more difficult problem. Indiana Code subsection 35-50-2-9(a) permits the death penalty or life without parole for "murder" if one of the aggravating circumstances listed under subsection (b) is found. In this case the State alleged three aggravators: subsection (b)(1), the defendant "intentionally kill[ed]" in the course of another listed felony; (b)(3), the defendant "committed the murder by lying in wait"; and (b)(9), "the defendant was on probation" after being sentenced for a felony. As to Hobert, the jury did not find the (b)(3) aggravator, and there is insufficient evidence to support the (b)(1) aggravator, leaving only the (b)(9) aggravator.

Here, even if we assume Pittman or Naylor killed Hobert, and each was an accomplice of the other, and each is punishable for felony murder, the issue remains whether the (b)(9) probation aggravator is met by proof that Pittman is guilty of felony murder without proof that he was the killer. We think it is not.

The (b)(9) aggravator, unlike the (b)(1) and (b)(3), turns on the defendant's status as a probationer, not on any act or omission. As such, it does not explicitly state that the defendant

13

must have killed the victim, with or without a specified mens rea. But we think the structure of this statute leads to the conclusion that the defendant must have been the sole killer or an active participant in the killing to be eligible for death penalty or life without parole. Otherwise stated, we think subsection 35-30-2-9(a) uses "murder" as defined in subsection 35-42-1-1(1) ("knowingly or intentionally kills another human being"), and does not include felony murders defined in subsections 35-42-1-1(2) and (3) that do not also constitute murders under subsection (1). Murder as defined under the felony murder provision includes deaths, even accidental, that occur while the defendant is committing a specified felony. Subsection 35-50-2-9(b)(1) allows the death penalty or life without parole for intentional killing in the course of some, but not all, of these felonies, omitting, for example, consumer product tampering or dealing in a section 35-48-2-10 lower-scheduled controlled substance, such as Ambien, Valium, or Xanax. Most other eligibility aggravators require that the defendant have committed some act, such as lying in wait, hiring to kill, etc., that makes clear the defendant is assumed to be the killer. A few, however, require a "murder" but do not require some additional act by the defendant. If a felony murder satisfied the "murder" requirement, an accidental death caused by an accomplice in a felony not listed in subsection 35-50-2-9(b)(1), such as consumer product tampering, would subject the defendant to the death penalty. We think such a disproportionate result was not contemplated by the legislature. Rather, we think the statute contemplates the definition of "murder" as described in 35-42-1-1(1). As discussed above, the evidence does not establish beyond a reasonable doubt that Pittman killed Hobert and therefore there is insufficient evidence to establish that the killing of Hobert was a murder as described in 35-42-1-1(1). We reach this conclusion purely as a matter of statutory interpretation.

We find one sentence of life without parole that is supported by the evidence as to all three aggravators and one that is not supported by any aggravators. We are required to set aside the life sentence as to Hobert's death for lack of proof as to a subsection 35-50-2-9(b) aggravator. We revise Pittman's sentence for the murder of Hobert to a term of sixty-five years, the current maximum sentence for murder under section 35-50-2-3, under our constitutional power to review and revise sentences. Ind. Const., art. 7, § 4.

14

## V. Consecutive Sentences

Pittman urges this Court to revise his consecutive sentences to concurrent terms in light of the insufficiency of the sentencing statement and the mitigating circumstances he raised at the sentencing hearing.[2] As explained in Part I, the trial court's sentencing statement was sufficient and does not necessitate revision of Pittman's sentences. Similarly, the claimed mitigating circumstances do not require revision of the consecutive sentences. The trial court, having heard Pittman's mitigating evidence, found that "the aggravators clearly outweigh the mitigators." The court then considered the jury's recommendation of two life without parole sentences and the shootings of Linda and Myrtle at close range in deciding to impose consecutive sentences for all counts except theft and conspiracy to commit burglary. Consecutive sentences reflect the significance of multiple victims. McCann v. State, 749 N.E.2d 1116, 1120 (Ind. 2001). Given the nature of Pittman's offenses and his character, the trial court's order imposing consecutive sentences was appropriate.

## Conclusion

Pittman's convictions are affirmed, as are his sentences for the murder of Myrtle Satterfield, attempted murder of Linda Pittman, conspiracy to commit burglary, theft, and auto theft. This case is remanded to the trial court with instructions to enter a sentence of 65 years for the murder of Hobert Pittman, to be served consecutively to his other sentences.

Shepard, C.J., and Dickson, Sullivan, and Rucker, JJ., concur.

---

[2] Pittman contends that because the trial court departed from the advisory sentences, his consecutive sentences were not authorized by Indiana Code section 35-50-2-1.3(c) (West Supp. 2007). After Pittman's brief was filed, this Court addressed the same argument in Robertson v. State, 871 N.E.2d 280 (Ind. 2007), and held that section 35-50-2-1.3(c) permits nonadvisory terms to be ordered consecutively. In his reply brief, Pittman acknowledged this Court's holding in Robertson and instead requested that we revise his sentence in light of the mitigating circumstances under our Appellate Rule 7(B) authority to review and revise sentences.