


FILED
Jun 26 2024, 2:54 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 22S-LW-310

## Cohen B. Hancz-Barron,

*Appellant*

–v–

## State of Indiana,

*Appellee*

Argued: January 18, 2024 | Decided: June 26, 2024

Direct Appeal from the Allen Superior Court
No. 02D05-2106-MR-11
The Honorable Frances C. Gull, Judge

**Opinion by Chief Justice Rush**

Justices Massa, Slaughter, Goff, and Molter concur.

**Rush, Chief Justice.**

A jury found Cohen Hancz-Barron guilty of murdering a young mother and her three children and recommended a sentence of life imprisonment without the possibility of parole. The trial court accepted the jury's recommendation and imposed four consecutive life sentences. In this direct appeal, Hancz-Barron challenges the sufficiency of evidence to sustain his convictions and the trial court's decision allowing the State to recall a witness. He also challenges his sentence on both statutory and constitutional grounds. We ultimately reject each challenge and affirm.

# Facts and Procedural History

In June 2021, Sarah Zent lived in Fort Wayne with her three young children, C.Z. (five years old), As.Z. (three years old), and Au.Z. (two years old). Sarah had dated Cohen Hancz-Barron on and off previously, and he was staying at her house at that time. He had been staying there for about a month when, on the morning of June 2, neighbors and family members grew concerned after Hancz-Barron drove away in a neighbor's truck at dawn and Sarah did not respond to texts or calls. Around 11:00 a.m., a family member discovered the bodies of Sarah and the children hidden underneath blankets on Sarah's bed, lying face-down, and covered in blood. A forensic pathologist later estimated they were killed around 2:00 a.m. or 3:00 a.m.

The injuries inflicted in those early morning hours were horrific. Sarah and each child suffered multiple injuries, including stab wounds that severed their jugular veins and carotid arteries. Sarah, who was twenty-six years old, had been stabbed approximately twenty-four times in her neck and abdomen. Her hands were cut and bruised, signifying that she likely fought back. She had also been strangled manually and with an extension cord, and her body bore signs of suffocation. C.Z., who weighed forty-eight pounds, was stabbed about nineteen times, mostly around his neck, head, arms, and chest, and the back of his head was bruised from a blunt force injury. He also had defensive wounds on his arms and fingers. As.Z., who weighed thirty-six pounds, was stabbed about eleven times

through all sides of his neck as well as his abdomen. His neck wounds were so deep that his windpipe had been punctured. And Au.Z., who weighed twenty-six pounds, had been stabbed four times in her neck, which punctured her windpipe and caused her to swallow blood. She also sustained the same kind of blunt force injury as C.Z. to the back of her head.

Both where the bodies were found and elsewhere, the interior of the house was in disarray. In the downstairs bedroom, piles of toilet paper were found near the bodies, and food and clothes were strewn about. Also downstairs, a chair was propped underneath the front-door handle, a can of WD-40 was sitting next to a lit stove burner, and the couch was saturated with oil. In the upstairs bathroom, a pool of vomit was on the floor, and a "big blood splatter" was in the bathtub. Several items were eventually removed from the home for testing, including a pair of gardening gloves that were lying near Au.Z.'s hand in the bedroom and a blue latex glove that was behind the toilet in the bathroom.

Hancz-Barron quickly became the primary suspect. In the evening before the murders, Sarah's neighbor and good friend, Richard Bevelle, worked on cars and hung out with Sarah, Hancz-Barron, and two others until about midnight. Before going to bed, Bevelle saw Sarah and Hancz-Barron through his doorbell camera smoking a cigarette "on the steps on the side of the house." Then, just before 6:00 a.m., Hancz-Barron messaged Bevelle on Instagram, asking for permission to borrow Bevelle's truck to go to a local hospital because Hancz-Barron's "sister was in a car accident." Bevelle responded that he would not lend Hancz-Barron the truck but offered to give him a ride to the hospital. Hancz-Barron did not respond, and soon after, Bevelle heard someone start his truck and drive away. Bevelle correctly assumed Hancz-Barron had taken the truck by using a spare key Bevelle had given Sarah. And so, he spent the morning looking for his truck and trying unsuccessfully to contact Hancz-Barron. Not finding his truck or Hancz-Barron at the hospital, Bevelle returned to Sarah's house, which was unlocked, and entered. But because he "felt like something wasn't right," he stepped out and contacted Sarah's family. Sarah's mother, sister, and sister's boyfriend arrived at the home, eventually located the bodies, and called 911.

In the hours following the murders, Hancz-Barron communicated sporadically with several family members and an acquaintance. At 3:21 a.m., Hancz-Barron called his stepmother, telling her that she needed to move and change her name and that she would never speak to him again when she found out what he had done. He also visited his mother for a few minutes around 6:15 a.m., told her that he had been injured, and asked if she had any money or duct tape. Then, after Bevelle messaged Hancz-Barron multiple times on Instagram with no response, Hancz-Barron finally responded at 10:21 a.m. that he was on his way to Sarah's house. But he instead drove over one-hundred miles to an acquaintance's apartment in Lafayette where he knocked on her door around 11:00 a.m. and told her that he had been "kicked out of the place that he was at." Hancz-Barron also told her that "he was suicidal and he had cuts to his wrists," but she did not see any injuries. About two hours later, law enforcement tracked Hancz-Barron to the apartment where they found him in the kitchen holding a blood-stained knife. After Hancz-Barron complied with officers' commands to drop the knife, they arrested him.

The State charged Hancz-Barron with four counts of murder and sought a sentence of life without the possibility of parole (LWOP) based on the existence of two statutory aggravators: he committed multiple murders; and three of the victims were under the age of twelve. Ind. Code § 35-50-2-9(b)(8), (12). At trial, the State presented photographic, DNA, video, and physical evidence as well as testimony from family members, friends, law enforcement, a forensic pathologist, and a forensic biologist. The jury found Hancz-Barron guilty as charged.

At sentencing, the State incorporated the evidence presented during the guilt phase to support the two statutory aggravators. The defense presented mitigating evidence through testimony from both Hancz-Barron's mother and a forensic psychologist who examined Hancz-Barron after his arrest. Ultimately, the jury found the State proved both statutory aggravators beyond a reasonable doubt, found the aggravating circumstances outweighed the mitigating circumstances, and recommended "a sentence of life imprisonment without parole." The trial court then found "more than sufficient evidence to support" the jury's decision, and sentenced Hancz-Barron to four consecutive LWOP

sentences. Hancz-Barron directly appealed to this Court. *See* Ind. Appellate Rule 4(A)(1)(a). Additional facts are provided below where necessary.

# Discussion and Decision

When a defendant is charged with murder and the State seeks an LWOP sentence based on an aggravating circumstance provided by statute, trial may proceed in two stages: a guilt phase and a penalty phase.

During the guilt phase, the State must prove each element of the murder beyond a reasonable doubt. I.C. §§ 35-41-4-1(a), 35-42-1-1(1). If the case is tried to a jury and it finds the defendant guilty, it then reconvenes for a sentencing hearing. *Id.* § -50-2-9(d). During this penalty phase, the jury "may consider all the evidence introduced at the trial stage of the proceedings, together with new evidence presented at the sentencing hearing." *Id.* To recommend LWOP, the jury must (1) find "the state has proved beyond a reasonable doubt that at least one" statutory aggravator exists, (2) "provide a special verdict form for each aggravating circumstance alleged," and (3) find that "any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances." *Id.* § -9(d), (l). If those three steps are satisfied and the jury recommends LWOP, "the court shall sentence the defendant accordingly." *Id.* § -9(e).

Here, Hancz-Barron makes two arguments related to the guilt phase and three arguments related to the penalty phase. As for the guilt phase, Hancz-Barron contends his convictions are not supported by sufficient evidence and the trial court abused its discretion in allowing the State to recall a witness over his objection. We disagree and hold that sufficient evidence supports his convictions and that the trial court did not abuse its discretion. As for the penalty phase, Hancz-Barron argues the jury erred in finding the aggravating circumstances outweighed the mitigating circumstances, his sentence is inappropriate under Indiana Appellate Rule 7(B), and his sentence violates Article 1, Section 16 of the Indiana Constitution and the Eighth Amendment to the United States

Constitution. We again disagree and hold that we cannot review the jury's weighing of aggravating and mitigating circumstances, Hancz-Barron has not shown that his sentence is inappropriate, and his sentence is not unconstitutional. Accordingly, we affirm.

# I. We affirm Hancz-Barron's murder convictions.

Hancz-Barron raises two issues related to the guilt phase of his trial. He argues his convictions are not supported by sufficient evidence, and the trial court committed reversible error in allowing the State to recall one of its witnesses. We address each argument in turn.

## a. Sufficient evidence supports Hancz-Barron's convictions.

Sufficiency-of-the-evidence claims trigger a deferential standard of review in which we "neither reweigh the evidence nor judge witness credibility, instead reserving those matters to the province of the jury." *Brantley v. State*, 91 N.E.3d 566, 570 (Ind. 2018). A conviction is supported by sufficient evidence if "there is substantial evidence of probative value supporting each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Willis v. State*, 27 N.E.3d 1065, 1066 (Ind. 2015). In conducting that review, we consider only the evidence that supports the jury's determination, not evidence that might undermine it. *Teising v. State*, 226 N.E.3d 780, 783 (Ind. 2024).

To prove that Hancz-Barron was guilty of the four counts of murder, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally killed Sarah, C.Z., As.Z., and Au.Z. I.C. § 35-42-1-1(1). Hancz-Barron concedes the four victims were knowingly or intentionally killed, arguing only that the State's evidence was insufficient to prove he was the person responsible for their deaths. We disagree.

Hancz-Barron's primary argument is that the State failed to provide "direct evidence" that he committed the murders. But it is well-settled

that "circumstantial evidence alone" can sustain a murder conviction. *Sallee v. State*, 51 N.E.3d 130, 134 (Ind. 2016). And the State presented both circumstantial and direct evidence from which a reasonable jury could have found Hancz-Barron guilty.

 The jury was presented with ample circumstantial evidence that Hancz-Barron was the only other person inside Sarah's home at the time of the murders. Sarah's neighbor saw Hancz-Barron and Sarah outside of her home around 1:30 a.m., just thirty to ninety minutes before the forensic pathologist's estimated time of the murders. The home bore no evidence of forced entry, and surveillance footage recovered from a nearby school showed that no one came or went from the home until just before 6:00 a.m. That footage depicted a black truck leaving the street around 6:00am—the same time that Hancz-Barron stole the neighbor's truck under false pretenses.

Though presence at the scene alone is not sufficient to show guilt beyond a reasonable doubt, a defendant's presence combined with other circumstantial evidence is. *Pratt v. State*, 744 N.E.2d 434, 436 (Ind. 2001). Here, Hancz-Barron's guilt is reinforced by incriminating statements he made to family members and an acquaintance shortly after the murders. At 3:21 a.m., Hancz-Barron called his stepmother, told her to change her last name, said she needed to move, and added that she would never talk to him again when she found out what he had done. Then, after stealing the neighbor's truck, Hancz-Barron visited his mother, cried, seemed "very upset," and asked her if she had any money or duct tape. And before leaving, he told her, "Mom, it's bad. It's bad. It's really bad. Something bad has happened." A few hours later, Hancz-Barron arrived at his acquaintance's apartment in Lafayette where he was "pacing and acting weird . . . [l]ike something was bothering him." He also asked her to move the truck because it "might have been reported stolen."

Aside from the circumstantial evidence detailed above, the State also presented direct evidence that connected Hancz-Barron with the crime scene. His DNA—both alone and with the victims'—was found in swabs taken from Sarah's body, inside the right gardening glove found lying near Au.Z.'s hand, the blood droplet in the bathroom, and the blue latex

glove found behind the toilet. Additionally, the knife Hancz-Barron dropped when he was arrested fit the forensic pathologist's profile of the murder weapon. And swabs taken from that knife revealed a mixture of Hancz-Barron's and As.Z.'s DNA on the blade, and a mixture of Hancz-Barron's, Sarah's, and C.Z.'s DNA on the handle.

All in all, the State presented both circumstantial and direct evidence from which a reasonable jury could have found beyond a reasonable doubt that Hancz-Barron was the person responsible for murdering Sarah and her three children. His arguments to the contrary are simply a request for us to reweigh the evidence, which we cannot do. We thus hold the State presented sufficient evidence to support his convictions.

## b. The trial court did not abuse its discretion in permitting the State to recall a witness.

Our trial courts have broad discretion in controlling trial proceedings. *Wray v. State*, 547 N.E.2d 1062, 1066 (Ind. 1989). This discretion includes allowing parties to recall witnesses "to correct or add testimony due to mistake or oversight." *Boyd v. State*, 494 N.E.2d 284, 302 (Ind. 1986); *see also* Ind. Evidence Rule 611(a)(1). We thus review a court's decision to admit testimony from a witness who has been recalled for an abuse of discretion. *Wray*, 547 N.E.2d at 1066. Under this standard, reversal is warranted "only if the trial court's ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *McCoy v. State*, 193 N.E.3d 387, 390 (Ind. 2022). And we generally will not disturb a court's decision when the challenging party "had the opportunity to present contradictory evidence." *S.M. v. Elkhart Cnty. Off. of Fam. & Child.*, 706 N.E.2d 596, 598 (Ind. Ct. App. 1999).

Hancz-Barron challenges the trial court's decision that allowed the State to recall and elicit additional testimony from Ashley Luther, a forensic biologist. Luther testified on a Friday, and after returning from the weekend recess, the trial court granted the State's request over objection to recall Luther "to provide additional explanation" about DNA recovered from inside the right gardening glove found at the crime scene.

In arguing the court abused its discretion, Hancz-Barron contends Luther's initial testimony reflected the presence "of DNA from an unknown individual" but "[o]n her second trip to the stand, Hancz-Barron's DNA was included in the mixture." Thus, in his view, this was a "fundamental change in the testimony" that caused him prejudice. We disagree.

Contrary to Hancz-Barron's assertion, Luther did not fundamentally change her testimony. When Luther first testified, she explained that she developed a DNA profile from a sample taken from inside the right gardening glove, which she described as "a little more complicated" than the other samples taken from the gloves. She interpreted the DNA profile from that sample "as originating from three individuals," and she "was able to statistically include" Hancz-Barron, C.Z., and As.Z. "individually." But she then stated, "I was able to include Cohen Hancz-Barron and [C.Z.] at the same time or [C.Z.] and [As.Z.] at the same time, but not all three of them at the same time . . . ." Thus, as she had "two separate combined statistics for this particular sample," she stated, "[I]t's at least one trillion times more likely if it originated from Cohen Hancz-Barron, [C.Z.], and an unknown individual rather than three unknown, unrelated individuals or . . . at least one trillion times more likely if it originated from [C.Z.], [As.Z.], and an unknown individual than if it was from three unknown, unrelated individuals . . . ." The State did not ask Luther to explain her finding that the three individuals' DNA were present "individually . . . but not all three . . . at the same time." Nor did the State ask Luther for the statistical weight of the presence of each individual's DNA. Hancz-Barron then cross-examined Luther, and she was released from her subpoena.

Realizing its oversight, the State asked the trial court for permission to recall Luther to provide clarifying information about the sample from inside the right gardening glove. "[O]ut of an abundance of caution," the court granted the State's request, finding Luther would not be presenting "new information," but "just more explanation for the information" the jury already had. When Luther testified the second time, she shared additional statistical information about each person's inclusion in the sample, including that the DNA profile was "at least 12 million times more likely" to have come from Hancz-Barron and two other individuals

than from "three unknown, unrelated individuals." She also clarified that in mixtures involving "related individuals," it can be "very difficult to tell how many individuals are in that DNA profile." And she explained that the sample contained "an additional piece of [genetic] information" that complicated the analysis. But she noted that a "possible explanation of this is it's actually more than three individuals and that additional individual was at a very low, low level and was related, so it was hidden within the mixture that I was interpreting." Hancz-Barron again cross-examined Luther, during which she confirmed that everything she first testified to was correct and there were no changes to her scientific findings.

Thus, Luther presented consistent testimony that relied on mathematical probabilities to show the source of the DNA recovered from inside the right gardening glove. And in both her initial and subsequent examinations, she provided the high mathematical probabilities that Hancz-Barron's, C.Z.'s, and As.Z.'s DNA were included in the sample. Contrary to Hancz-Barron's claim, she did not testify that the DNA of an unknown individual was discovered on the glove. She instead referred to "unknown" individuals when discussing the "likelihood ratio" of each sample, or the likelihood that a "particular item of evidence is X number of times more likely if it came from a certain individual than if it didn't." Because Luther's additional testimony merely clarified information she had provided to the jury, the trial court did not abuse its discretion.

Additionally, Hancz-Barron has not shown that the court's decision affected his substantial rights. He had the ability to present contrary evidence and cross-examine Luther on both occasions. And the DNA results of the samples taken from the gardening gloves were not instrumental to his defense, as reflected by counsel's statement during closing argument: "[W]ho cares about these gardening gloves . . . That room was a mess. Nobody knows where those gardener gloves came from, when they were put on that bed . . . . And for them to tell you that there's a little bit of DNA here and there, they'd be soaked in the victims' blood. But they're not." Thus, contrary to his claim, the DNA from the glove was not "[c]ritical to the defense."

In sum, the trial court did not abuse its discretion in permitting the State to recall Luther. But even if we concluded otherwise, Hancz-Barron has not shown that the court's decision warrants reversal. Having found that Hancz-Barron's challenges related to the guilt phase fail, we now turn to his challenges related to the penalty phase.

## II.  We affirm Hancz-Barron's four consecutive LWOP sentences.

Hancz-Barron raises three issues related to the penalty phase of his trial. He argues the jury erred in determining that the aggravating circumstances outweighed the mitigating circumstances, his sentence is inappropriate under Appellate Rule 7(B), and his sentence is unconstitutional. We address each argument in turn.

### a.  The jury's weighing of aggravators and mitigators in recommending Hancz-Barron's LWOP sentence is not subject to appellate review.

As noted previously, a jury that finds a defendant guilty beyond a reasonable doubt must also find "any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances" to recommend LWOP. I.C. § 35-50-2-9(l)(2). Hancz-Barron does not challenge the jury's finding of the statutory aggravators. And he does not argue the jury received improper instructions, erred by not specifically identifying which mitigating circumstances it considered, or failed to state that it found the statutory aggravators outweighed those mitigating circumstances. Rather, he argues the jury erred in determining "that the aggravating circumstances outweighed the mitigating circumstances." The State correctly characterizes this argument as "non-cognizable."

Once a statutory aggravator is found by a jury beyond a reasonable doubt, Indiana law places within the jury's purview the process of balancing aggravating and mitigating circumstances. *Helsley v. State*, 43 N.E.3d 225, 230 (Ind. 2015). This balancing "is essentially a discretionary function as to which the jury has considerable leeway." *Pittman v. State*,

885 N.E.2d 1246, 1253 (Ind. 2008). And because juries are "traditionally not required to provide reasons for their determinations," *id.* at 1254, which the jury did not do here, there is simply no basis for us to evaluate its "weighing of the evidence and balancing of the mitigating circumstances against the aggravating circumstance," *Helsley*, 43 N.E.3d at 230. Thus, claims such as Hancz-Barron's are "nonjusticiable." *Id.*; *see also Ward v. State*, 903 N.E.2d 946, 960–61 (Ind. 2009).

### b. Hancz-Barron has not shown his sentence is inappropriate.

Hancz-Barron next seeks revision of his sentence under Appellate Rule 7(B), which allows us to revise a sentence if it is "inappropriate in light of the nature of the offense and the character of the offender." App. R. 7(B). Our principal task is "to attempt to leaven the outliers," not to achieve a "correct" result in every case. *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). And we generally defer to the sentence imposed unless a defendant presents "compelling evidence" portraying the nature of the offense and their character in a positive light. *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). Hancz-Barron has failed to present such compelling evidence.

The nature of Hancz-Barron's offenses was extraordinarily brutal. He violently killed Sarah and her three young children in their home and in the presence of each other, causing each victim extreme suffering. Though he concedes the offenses "were senseless and reprehensible," he argues "his culpability must also be assessed given that it appears" he "'snapped' and four innocents were killed." But even if he "snapped," evidence shows these murders were drawn-out, intensely physical, and far from instantaneous. He suffocated Sarah, strangled her with both hands and an extension cord, and stabbed her more than twenty times in the neck and abdomen. As for the children, he stabbed C.Z. approximately nineteen times in the neck, head, arm, and abdomen; he stabbed As.Z. about eleven times in his neck and abdomen; and he stabbed Au.Z. four times in her neck. Additionally, as the State points out, "no matter how the violence unfolded, at least three of the victims, at some point in time, had to watch as Hancz-Barron killed someone they loved." Then, after the murders,

Hancz-Barron stole a neighbor's truck, lied to family members about what happened, and drove over one-hundred miles away despite telling the neighbor that he was on his way back to Sarah's house. *See Oberhansley v. State*, 208 N.E.3d 1261, 1271 (Ind. 2023) (finding that a defendant's deceptive and devious behavior "aggravate[s] the nature of an offense"). There is absolutely no evidence, let alone compelling evidence, portraying the nature of these offenses in a positive light.

And to the extent Hancz-Barron contends that his four consecutive LWOP sentences are inappropriate because "the jury and the trial judge chose vindictive justice over reformation" as if he "had more than one life to live," it is well-settled that "[c]onsecutive sentences reflect the significance of multiple victims," *Pittman*, 885 N.E.2d at 1259. The trial court's decision to impose consecutive LWOP sentences for the murder of a mother and her three children does not render Hancz-Barron's sentence inappropriate. *Cf., e.g.*, *Clippinger v. State*, 54 N.E.3d 986, 992 (Ind. 2016) (affirming two consecutive LWOP sentences for the murder of two individuals).

The same is true for Hancz-Barron's character. When considering a defendant's character, their criminal history is relevant. *See, e.g.*, *Johnson v. State*, 986 N.E.2d 852, 857 (Ind. Ct. App. 2013). Hancz-Barron, who was twenty-one years old at the time of the murders, had accumulated a criminal history that included both violent and non-violent juvenile adjudications as well as a recent adult conviction for Level 5 felony robbery. A warrant was also issued for his arrest just two months before the murders because he removed the GPS ankle monitor mandated as part of his robbery sentence. This criminal history and conduct reflect poorly on Hancz-Barron's character.

Yet in arguing his character renders his sentence inappropriate, Hancz-Barron points to his rough childhood, age, alcohol and marijuana use that "stunted [his] brain development," and mental health history. We acknowledge he was the child of divorce, spent time in various homes, and lost his father at a young age. But "evidence of a difficult childhood is entitled to little, if any, mitigating weight." *Oberhansley*, 208 N.E.3d at 1272 (quoting *Wright v. State*, 168 N.E.3d 244, 269 (Ind. 2021)). And his mother

testified that he had a "wonderful childhood," characterizing their family unit as "strong." As for his age, Hancz-Barron was an adult when he committed these heinous murders. As for his education, he was an honors student at times, graduated high school, and completed a technical program in "truck engineering." This evidence reflects a man of at least average intelligence, and it also belies his claims of stunted brain development based on the use of alcohol and marijuana. And as for his mental-health history, though Hancz-Barron was diagnosed with bipolar disorder in early adolescence and with anti-social personality after the murders, he provides no evidence showing a nexus between those diagnoses and his criminal conduct. *See Covington v. State*, 842 N.E.2d 345, 349 (Ind. 2006).

Because Hancz-Barron has failed to produce compelling evidence portraying either the nature of his offense or his character in a positive light, he has failed to show that his sentence is inappropriate.

### c. Hancz-Barron's sentence is not unconstitutional.

We finally address Hancz-Barron's claims that his sentence constitutes cruel and unusual punishment under the Eighth Amendment and Article 1, Section 16. In noncapital cases, the Eighth Amendment's prohibition against cruel and unusual punishment contains a "narrow proportionality principle," *Ewing v. California*, 538 U.S. 11, 20 (2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 996–997 (1991)), that "the punishment should fit the crime," *id.* at 31 (Scalia, J., concurring in the judgment). Article 1, Section 16 likewise prohibits cruel and unusual punishments, but it goes a step further by explicitly requiring proportionality: "All penalties shall be proportioned to the nature of the offense." Ind. Const. art. 1, § 16. This requirement allows us to review the duration of a sentence, as it is possible for an otherwise lawful sentence to be unconstitutional as applied to a "particular defendant." *Knapp v. State*, 9 N.E.3d 1274, 1290 (Ind. 2014). We thus begin our analysis with this more-protective standard.

Article 1, Section 16 is violated "only when the criminal penalty is not graduated and proportioned to the nature of the offense." *Id.* In arguing his sentence violates Section 16, Hancz-Barron points to "his young age

and stunted brain development" as well as "his difficult youth and mental health history." His argument is therefore based on only personal characteristics. And "there is no authority for the proposition that such an offender-based argument is cognizable pursuant to Article 1, Section 16." *Kedrowitz v. State*, 199 N.E.3d 386, 409 (Ind. Ct. App. 2022), *trans. denied*. In any event, we hold that Hancz-Barron's sentence is graduated and proportioned to the nature of his heinous offenses. He massacred a family of four, including three young children, and inflicted horrific injuries on each victim. Receiving four consecutive LWOP sentences for these murders does not violate Article 1, Section 16. *Cf. Ramirez v. State*, 174 N.E.3d 181, 201 (Ind. 2021) (finding a defendant's LWOP sentence proportionate considering he brutally murdered a toddler who was entrusted to his care); *Shoun v. State*, 67 N.E.3d 635, 641–42 (Ind. 2017) (finding a defendant's LWOP sentence proportionate considering he mutilated and murdered his girlfriend).

Hancz-Barron's Eighth Amendment claim fails for similar reasons. Though he concedes "the imposition of four consecutive life sentences without parole might be seen as proportional to the number of people who lost their lives," he argues "the symbolic retribution of such a sentence seems disproportional given the number of lives Hancz-Barron has to live." But the United States Supreme Court has only rarely found a non-capital sentence in violation of the Eighth Amendment, when the sentence "is grossly disproportionate to the severity of the crime." *Rummel v. Estelle*, 445 U.S. 263, 271 (1980); *see Solem v. Helm*, 463 U.S. 277, 303 (1983). And a defendant who commits murder is categorically more deserving of "the most serious forms of punishment" than a defendant who does "not kill, intend to kill, or foresee that life will be taken." *Graham v. Florida*, 560 U.S. 48, 69 (2010). Indeed, as we recognized a decade ago, the Supreme Court has never found an LWOP sentence unconstitutional when imposed on an adult who committed murder. *Knapp*, 9 N.E.3d at 1291. This remains true today, and Hancz-Barron presents no reason to conclude otherwise. Because he committed the four murders as an adult, his reliance on Supreme Court cases involving juveniles is unavailing. And so too is his reliance on a case from a foreign jurisdiction interpreting its constitution. Ultimately, the number of Hancz-Barron's victims, the

ages of the three children he killed, and the extreme violence that characterized each murder establish that his sentence is not grossly disproportionate.

## Conclusion

For the reasons articulated above, we affirm Hancz-Barron's convictions and sentence.

Massa, Slaughter, Goff, and Molter, JJ., concur.

ATTORNEY FOR APPELLANT
Gregory L. Fumarolo
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE
Theodore E. Rokita
Attorney General of Indiana

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana