ATTORNEYS FOR APPELLANT
Steven E. Ripstra
Jasper, Indiana

Lorinda Meier Youngcourt
Huron, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana



# In the
# Indiana Supreme Court

No. 74S00-0707-DP-263

ROY LEE WARD,

*Appellant (Petitioner below),*

v.

STATE OF INDIANA,

*Appellee (Respondent below).*

Appeal from the Spencer Circuit Court, No. 74C01-0107-CF-158
The Honorable Robert J. Pigman, Judge

On Direct Appeal

**April 7, 2009**

**Dickson, Justice.**


The defendant, Roy Lee Ward, appeals his death sentence for the 2001 rape and murder of fifteen-year-old Stacy Payne in Dale, Spencer County, Indiana. We affirm the sentence.


This appeal follows the defendant's second trial. His first jury trial, in Spencer County, resulted in guilty verdicts for Murder, Rape, and Criminal Deviate Conduct, followed by a sentencing-phase jury trial that resulted in a death sentence. The sentence and convictions were reversed due to prejudicial pre-trial publicity. Ward v. State, 810 N.E.2d 1042 (Ind. 2004), *cert. denied*, 546 U.S. 926, 126 S.Ct. 395, 163 L.Ed.2d 273 (2005). On remand, the defendant sought

and obtained a new judge, and, following the defendant's request for a change of venue from Spencer County, the parties agreed to select the jury from Clay County,[1] with the trial to be held in the special judge's Vanderburgh County courtroom. The State proceeded on murder and rape charges, to which the defendant pleaded guilty.[2] A penalty phase jury then determined that the charged statutory aggravating circumstances were proven beyond a reasonable doubt, that the aggravating circumstances outweighed the mitigating circumstances, and that a death sentence should be imposed. The trial court sentenced the defendant accordingly, as required by statute.[3] The defendant now appeals his death sentence,[4] challenging: (1) the constitutionality of Indiana's death penalty statute; (2) the lack of a statutory written plan for selecting the petit jury pool; (3) the jury selection process; (4) the admission of evidence from a warrantless search; (5) the admission of photographic evidence; and (6) the appropriateness of the death sentence.

## 1. Constitutionality of Indiana's Death Penalty Statute

The defendant contends that the Indiana death penalty statute is unconstitutional under both the United States Constitution and the Indiana Constitution. In support, he presents seven arguments, each of which this Court has previously rejected: (1) the statute allows for the death sentence in the absence of a jury finding that aggravators outweigh the mitigators beyond a reasonable doubt (rejected in Ritchie v. State, 809 N.E.2d 258, 264-68 (Ind. 2004), *cert. denied*, 546 U.S. 828, 126 S.Ct. 42, 163 L.Ed.2d 76 (2005); and State v. Barker, 809 N.E.2d 312, 314-15 (Ind. 2004), *reh'g and remand granted*, 826 N.E.2d 648 (Ind. 2005), *cert. denied*, 546 U.S. 1022, 126 S.Ct. 666, 163 L.Ed.2d 537 (2005)); (2) it permits the jury to make a sentencing recommendation in violation of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (rejected in

---

[1] The county seat of Clay County (Brazil, Indiana) is more than 100 miles from the county seat of Spencer County.

[2] Pursuant to a plea agreement, the State dismissed the count of criminal deviate conduct as well as the aggravating circumstance of murder during the course of criminal deviate conduct.

[3] Indiana Code § 35-50-2-9(e)(2) states: "If the jury reaches a sentencing recommendation, the court shall sentence the defendant accordingly."

[4] The defendant was also sentenced to fifty years for Rape, a sentence he is not challenging here.

Holmes v. State, 820 N.E.2d 136, 138-39 (Ind. 2005); and Ritchie, 809 N.E.2d at 266); (3) the death penalty is disproportionate and vindictive because it carries no deterrent value (rejected in Ritchie, 809 N.E.2d at 263 (citing Evans v. State, 563 N.E.2d 1251, 1264 (Ind. 1990))); (4) it is imposed arbitrarily and capriciously with undue risk for discrimination and mistake (rejected in Corcoran v. State, 739 N.E.2d 649, 651-53 (Ind. 2000), *reh'g granted*, 827 N.E.2d 542 (Ind. 2005); and Harrison v. State, 644 N.E.2d 1243, 1257-58 (Ind. 1995), *superseded on other grounds as recognized in* Allen v. State, 737 N.E.2d 741, 743 n.5 (Ind. 2000)); (5) it is applied without a rational and uniform analysis for appellate review (rejected in Hough v. State, 690 N.E.2d 267, 277 (Ind. 1997) (citing Bivins v. State, 642 N.E.2d 928, 948 (Ind. 1994)), *cert. denied*, 525 U.S. 1021, 119 S.Ct. 550, 142 L.Ed.2d 457 (1998); and Wisehart v. State, 484 N.E.2d 949, 958 (Ind. 1985), *cert. denied*, 476 U.S. 1189, 106 S.Ct. 2929, 91 L.Ed.2d 556 (1986)); (6) it fails to require that the factfinder consider all mitigation evidence proffered (rejected in Wisehart v. State, 693 N.E.2d 23, 54 (Ind. 1998) (citing Matheney v. State, 688 N.E.2d 883, 907 (Ind. 1997)), *cert. denied*, 526 U.S. 1040, 119 S.Ct. 1338, 143 L.Ed.2d 502 (1999)); and (7) the statute fails to guide a sentencer's discretion in choosing between a death sentence and a life sentence without parole (rejected in Corcoran, 739 N.E.2d at 653 (citing Stevens v. State, 691 N.E.2d 412, 429 (Ind. 1997), and Wrinkles v. State, 690 N.E.2d 1156, 1165 (Ind. 1997))).

We decline to revisit these issues.

## 2. Absence of Statutory Written Petit Jury Selection Plan

The defendant contends that Clay County, from which his jurors were drawn, failed to meet the statutory requirements for a written plan for selecting the venire for petit juries and that this failure, notwithstanding the otherwise proper selection of his jury, requires that his sentence be set aside.

Minor irregularities in the jury selection process do not normally constitute reversible error absent a showing of substantial prejudice to the defendant's rights. Azania v. State, 778 N.E.2d 1253, 1257 (Ind. 2002), *superceded on other grounds*, State v. Azania, 875 N.E.2d 701 (Ind. 2007); *accord* Wells v. State, 848 N.E.2d 1133, 1141 (Ind. Ct. App. 2006), *cert. denied*,

549 U.S. 1322, 127 S.Ct. 1913, 167 L.Ed.2d 567 (2007). We have recognized, however, that absent substantial compliance with the statute, "the accused need not show actual prejudice." Azania, 778 N.E.2d at 1257.

Chapter 5 of Title 33, Article 28 and Indiana Jury Rules 2 through 9 specify detailed procedures for jury selection and service. Among these, one statutory provision requires the jury commissioner, under a judge's supervision, to prepare a written plan for selecting grand and petit jurors, which plan must be approved by the county's judges and maintained on file for public inspection. Ind. Code § 33-28-5-12.[5] The exclusive means by which a defendant may challenge a jury on the ground that it was not selected in conformity with any of the requirements of Chapter 5 are detailed in Indiana Code § 33-28-5-21. This section permits the trial court in a criminal case to stay the proceedings, dismiss an indictment, or grant other appropriate relief. But before granting any such relief, the trial court must determine "that in selecting either a grand jury or a

---

[5] The section in effect at the time of the defendant's second trial read as follows:
  33-28-5-12. Written plan for selection of grand and petit jurors.
        (a) Under the supervision of the supervising judge, the jury commissioner shall prepare a written plan for the selection of grand and petit jurors in the county. The plan must be designed to achieve the objectives of and otherwise comply with, this chapter. The plan must specify the following:
                (1) Source of names for the master list.
                (2) Form of the master list.
                (3) Method of selecting names for the master list.
                (4) Forms of and method for maintaining records of names drawn, jurors qualified, and juror's excuses and reasons to be excused.
                (5) Method of drawing names of qualified jurors for prospective service.
                (6) Procedures to be followed by prospective jurors in requesting to be excused from jury service.
                (7) Number of petit jurors that constitutes a panel for civil and criminal cases or a description of the uniform manner in which this determination is made.
        (b) The plan must be placed into operation after approval by the judges of the courts. The judges of the courts shall examine the plan to determine whether it complies with this chapter. If the plan is found not to comply, the court shall order the jury commissioner to make the necessary changes to bring the plan into compliance.
        (c) The plan may be modified at any time according to the procedure specified under this chapter.
        (d) The plan must be submitted to the jury commissioner to the judges of the courts. The judges of the courts shall approve or direct modification of the plan not later than sixty (60) days after its receipt. The approved plan must go into effect not later than sixty (60) days after approval by the judges of the courts.
        (e) The plan is a public document on file in the office of the jury commissioner and must be available for inspection at all reasonable times.
The section was amended in 2007. P.L. 118-2007.

4

petit jury there has been a *substantial failure to comply* with this chapter." *Id*. (emphasis added).

The defendant timely challenged the absence of a written plan, and the trial court conducted a hearing. The Clay County Clerk testified that all procedures were followed in the selection of potential jurors. Tr. at 1085. The Clerk explained that the jury panel is collected from a compact disc provided to her by the Indiana Supreme Court Division of State Court Administration. Names on the disc come from the Indiana Bureau of Revenue and the Indiana Bureau of Motor Vehicles, and these names are then purged of duplicates, people under 18, and deceased persons.[6] With this disc, the Clerk used a commercial jury management system to formulate the jury pool by randomly selecting names from the master list. Following the Clerk's testimony, the trial court denied the defendant's motion premised on the failure to establish and file a written plan.

On appeal, the defendant argues that because a juror selection plan was neither prepared, approved by any Clay County judge, submitted to the jury commissioner, nor filed as a public document in the office of the Clay Circuit Court, the resulting complete failure to abide by the statutory requirement for a plan should be deemed substantial non-compliance and that prejudice should be presumed.

Other than the lack of a formal written and filed plan, the defendant does not claim any irregularities in the selection and composition of the petit jury venire in his case. In other words,

---

[6] Indiana Jury Rule 2 directs the jury assembly process and requires the jury administrator to compile the jury pool annually by selecting names from lists approved by the Indiana Supreme Court. In accordance with this rule, in September 2005 the Indiana Supreme Court approved the first statewide jury list of 4,503,032 records, a number that closely corresponds to the State's 18-and-older population according to the 2000 Indiana Census (4,506,089). The resulting list, first available for use in 2006, was created by combining Indiana Bureau of Motor Vehicle and Indiana Department of Revenue records and eliminating duplicates. With assistance from Purdue University, the Supreme Court Judicial Technology and Automation Committee further filtered the resulting list by removing individuals identified as deceased or underaged and those who had moved out of state. Finally, the list was validated against U.S. Postal Service address data, which standardized the form of addresses, added the county for each address, and flagged addresses that may have errors. The resulting statewide jury list was first made available to counties by compact disc, and more recently is becoming available electronically over a secure extranet website. Indiana Judicial Technology and Automation Committee, Statewide Jury Pool Project, http://www.in.gov/judiciary/jtac/programs/jurypool.html (last visited Jan. 27, 2009).

he does not point to any procedural detail that such a written plan might provide that is not already covered by the other statutory provisions or the Indiana Jury Rules. He does not question that the venire was prepared in exact compliance with all other statutory provisions and the Indiana Jury Rules, the specifics of which obviate and supplant the function of the statutory requirement for a written plan.

The defendant has not established substantial non-compliance with the requirements for the selection of the petit jury venire. He is not entitled to relief on this issue.

### 3. Jury Selection

Apart from the preceding claim, the defendant presents two discreet claims of trial court error regarding the conduct of voir dire, the trial court's jury selection process. He contends that the trial court erred (a) in failing to strike ten prospective jurors for cause, and (b) by changing the method of questioning potential jurors about the death penalty from initially speaking with one juror at a time to later discussing the issue with small groups of jurors. To support these claims, the defendant argues that he was forced to use his peremptory challenges on prospective jurors who should have been removed for cause, thus compelling him to accept other jurors who, though not challengeable for cause, held biases favorable to the death penalty for the pleaded-to offenses and unfavorable to dispassionate consideration of his mitigation evidence.[7]

Jury selection in this case arose under unconventional circumstances. Guilt was not at issue. The defendant pleaded guilty to Murder[8] and Rape,[9] class A felonies. Under the plea agreement, the court would determine the sentence for the Rape conviction, but the defendant

---

[7] The State disputes the defendant's claimed exhaustion of his peremptory strikes. It concedes that the record reflects his exhaustion of the two peremptory strikes allocated for selecting alternates, but asserts that the record does not establish that the defendant exhausted twenty peremptory challenges in selecting the twelve regular jurors. In his Reply Brief, the defendant points out that the trial court expressly noted that the defense had exhausted its peremptory challenges as to the regular jurors. We accept the trial court's determination and treat the defendant's claim of complete exhaustion to be accurate.

[8] Ind. Code § 35-42-1-1(1).

[9] Ind. Code § 35-42-4-1(a)(1), (b)(2).

6

reserved the right to a penalty phase jury trial on the State's request for the death sentence. At the penalty phase trial, the State sought the death penalty asserting three statutory aggravating circumstances: (1) the defendant committed the murder by intentionally killing the victim while committing rape,[10] (2) the defendant committed the murder while on probation for committing a felony,[11] and (3) the victim was mutilated or tortured while still alive.[12] Appellant's App'x at 1055. The issues before the penalty phase jury were whether one or more of these aggravating circumstances was proven beyond a reasonable doubt; if so, whether any mitigating circumstances that exist were outweighed by the aggravating circumstances appropriate for consideration; and, if so, whether to recommend a death sentence, life without parole, or a term of years. Ind. Code § 35-50-2-9(e).

**(a) Denial of Defendant's Challenges for Cause**

The defendant contends that the trial court erred in failing to grant his for-cause challenges as to ten jurors, arguing that their opinions and responses showed a tendency to recommend death automatically upon the fact of the defendant's guilt. This, he urges, rendered them ineligible as jurors by violating his constitutional due process rights to a fair trial.[13] Claiming that his challenges for cause should have been granted, the defendant argues that he was thereby prejudiced because he had to use all of his peremptory challenges on these jurors and was thus "forced to accept other jurors who although not challengeable for cause were biased against his evidence." Br. of Appellant at 16.

The United States Supreme Court addressed a similar claim in <u>Ross v. Oklahoma</u>, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), also an appeal in a capital murder trial. After

---

[10] Ind. Code § 35-50-2-9(b)(1)(F).

[11] Ind. Code § 35-50-2-9(b)(9)(C).

[12] Ind. Code § 35-50-2-9(b)(11).

[13] The defendant's brief recites portions of Indiana Code § 35-37-1-5, which applies to challenges for cause, but he presents no argument applying the facts to the statute or otherwise establishing any independent claim for relief under the statute. We therefore deem any claim for violation of this statute to be procedurally defaulted.

the trial court denied the defense's for-cause challenge to a prospective juror, the defense exercised a peremptory challenge, ultimately using all of its allotted peremptory challenges. *Id*. at 83-84, 108 S.Ct. at 2276, 101 L.Ed.2d at 87. The defense did not, however, challenge for cause any of the jurors who actually decided the case. *Id*. at 84, 108 S.Ct. at 2276, 101 E.Ed.2d at 87. The <u>Ross</u> Court found that any claim that the jury was partial must focus not on the removed juror, but rather "on the jurors who ultimately sat." *Id*. at 86, 108 S.Ct. at 2277, 101 L.Ed.2d at 88. The Court stated:

> Petitioner was undoubtedly required to exercise a peremptory challenge to cure the trial court's error. But we reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated. We conclude that no violation of petitioner's right to an impartial jury occurred.

*Id*. at 88, 108 S.Ct. at 2278, 101 L.Ed.2d at 90 (internal citations omitted). The Court concluded that failing to dismiss the juror for cause, while error, "did not deprive petitioner of an impartial jury or of any interest provided by the State." *Id*. at 91, 108 S.Ct. at 2280, 101 L.Ed.2d at 92.

In light of this reasoning, it is irrelevant whether the trial court erred in denying any of the defendant's challenges for cause. Viewed properly through <u>Ross</u>'s lens, the issue of whether the defendant had an impartial jury must focus on one or more of the jurors who actually sat and rendered the decision. The United States Supreme Court has held, "A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do," and that "[i]f even one such juror is empanelled and the death sentence is imposed, the State is disentitled to execute the sentence." <u>Morgan v. Illinois</u>, 504 U.S. 719, 729, 112 S.Ct. 2222, 2229-30, 119 L.Ed.2d 492, 502-03 (1992). The defendant does not, however, assert this claim as to any of the jurors who served in his penalty phase trial. Of the jurors who were selected to serve, only one was challenged for cause by the defendant, and this challenge was denied by the trial court.[14] The defendant does not question this ruling on appeal.

---

[14] The defense challenged juror 105 for cause, asserting as its reason "shifts the burden to the defendant." Tr. at 801. The trial court denied this challenge. *Id.* at 803-04.

We therefore decline the defendant's request for reversal of his death penalty sentence premised on the trial court's failure to grant his challenges for cause with respect to jurors he later removed by peremptory challenge.

**(b) Changing From Individualized to Group Voir Dire**

The defendant also contends that the trial court erred by changing the mode of voir dire from individual to group questioning of prospective jurors. This change, he asserts generally, "exposed members of the jury panels to grossly prejudicial opinions and statements." Br. of Appellant at 16.

Two days before the trial began, the trial judge informed counsel that, in light of the broadcast publicity regarding unidentified "events of last week," the questioning of prospective jurors regarding the death penalty and publicity would be done individually, away from other prospective jurors. But the trial judge quickly recognized that "[a]t the rate we[']re going, it will be months, not days, before we get a jury picked," Tr. at 528, and modified that plan following lunch recess on the first day of voir dire. The court explained that henceforth the "only individual voir dire will be on the issue of pretrial publicity" and that "everybody else will be voir dired together on the death penalty questions." *Id.* This new procedure was then implemented despite the defense's general objection "on due process grounds." *Id.* at 529.

Other than his general trial objection to the judge's change in format, however, the defendant does not identify any particular objection made during the ensuing voir dire asserting improper exposure of prospective jurors to prejudicial statements. He does not assert on appeal any claim that specific jurors were permitted to serve following a trial court failure to grant a defense challenge for cause arising out of any such incidents.

A trial court has broad discretionary power to regulate the form and substance of voir dire. Kalady v. State, 462 N.E.2d 1299, 1307 (Ind. 1984). Individually sequestered voir dire is not mandated in any case under Indiana law, including capital cases, absent highly unusual or potentially damaging circumstances. Holmes v. State, 671 N.E.2d 841, 854 (Ind. 1996), *cert.*

9

*denied*, 522 U.S. 849, 118 S.Ct. 137, 139 L.Ed.2d 85 (1997); Brown v. State, 563 N.E.2d 103, 105-06 (Ind. 1990); Lowery v. State, 547 N.E.2d 1046, 1049 (Ind. 1989), *cert. denied*, 498 U.S. 881, 111 S.Ct. 217, 112 L.Ed.2d 176 (1990). The trial court may structure voir dire to meet discrete circumstances, but does not abuse its discretion in managing voir dire if the defense fails to bring such discrete circumstances to the court's attention. Holmes, 671 N.E.2d at 854.

The defendant has not established reversible error in the trial court's modification of the format for questioning potential jurors in this case.

### 4. Admission of Evidence from the Search of Defendant

The defendant contends that the trial court erred in admitting evidence that police collected from his person following his arrest but before a search warrant issued.[15] The trial court denied his suppression motion before the penalty phase trial began, overruled his objection during the penalty phase trial, and admitted the items in evidence. On appeal, the defendant argues that the search fell within no exception to the prohibition against warrantless searches, and that he was entitled to the advice from counsel with respect to the search.

We initially observe that the challenged evidence is relevant only to the defendant's guilt, not to his sentence. Guilt was not in issue, however, because the defendant pleaded guilty, and the sole remaining issue for trial was his sentence. The challenged evidence thus held little, if any, relevance to any penalty phase issues. But the State sought and obtained its admission as evidence in the penalty phase, and the defendant's appeal challenges its admissibility not on grounds of relevancy but as the fruits of an unconstitutional search and seizure. Even if its admission were to be found erroneous, such error would be harmless beyond a reasonable doubt as to the defendant's sentence and would not require that the sentence be reversed.

The State does not argue harmless error, however, and we elect alternatively to address

---

[15] The challenged items, identified by the police numbering system, are: #101 black shirt, #102 gold chains, #103 left shoe, #104 left sock, #105 right shoe, #106 right sock, #107 black shorts, #108 underwear, #109 hair from upper left leg, #110 upper left leg (swab), #111 lower left leg (swab), #112 upper right leg (swab), #113 lower left leg (swab), #114 back of upper right leg (swab), and #115 back of upper left leg (swab). Tr. at 147-48.

the defendant's search and seizure claim. Appellate courts review de novo a trial court's ruling on the constitutionality of a search or seizure. Membres v. State, 889 N.E.2d 265, 268 (Ind. 2008), *reh'g denied*. The trial court's factual determinations, however, will not be overturned unless clearly erroneous. *Id.* On appeal, the reviewing court does not reweigh the evidence and considers conflicting evidence most favorably to the trial court's ruling. State v. Quirk, 842 N.E.2d 334, 340 (Ind. 2006).

Responding to a young child's 911 call reporting that a home intruder was attacking her older sister, law enforcement officials entered the home to find the defendant holding a knife and covered with sweat, and fifteen-year-old Stacy Payne lying in a pool of blood on the kitchen floor, nude from the waist down, and with abdominal contents "outside her body." Tr. at 1299, 1311. Handcuffed and placed in a police car, the defendant was given the Miranda[16] warnings, refused to sign the "rights form," and asked to talk with a lawyer. While photographing the defendant at the scene, a police detective noticed a dark stain on the defendant's shirt and removed it from him. The police took the defendant to a nearby hospital to collect samples and there observed more stains on the defendant's clothing that appeared to be blood. Reasonably concerned that potential evidence could be lost or destroyed, the police collected these items, as well as hair stuck to the defendant's body, and swabbed dark stain areas of the defendant's skin. This evidence was obtained without the defendant's consent. As noted in footnote 15, the defendant contests the collection of his shirt, shorts, shoes, socks, gold chain, underwear, loose hairs from his leg, and swabs of suspected bloodstains on his skin.

The defendant urges that the search violated both the federal and state constitutions. Under federal Fourth Amendment jurisprudence, warrantless searches are generally prohibited unless an exception exists. One recognized exception is for searches incident to a lawful arrest. Edwards v. State, 759 N.E.2d 626, 629 (Ind. 2001). Moreover, a full search of the person after arrest "is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." United States v. Robinson, 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427, 441 (1973). And a search incident to lawful arrest under federal jurisprudence may "involve a relatively extensive exploration of the person." *Id.* at 227, 94 S.Ct.

---

[16] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

at 473, 38 L.Ed.2d at 436. Although a search incident to lawful arrest could be invalidated if it was "extreme or patently abusive," *id.* at 236, 94 S.Ct. at 477, 38 L.Ed.2d at 441, the search of the defendant's person in this case was neither. Another recognized exception to the warrant requirement is the presence of exigent circumstances, including the need to prevent imminent destruction of evidence. Holder v. State, 847 N.E.2d 930, 936-37 (Ind. 2006). The warrantless search and resulting admission of evidence was proper in this case under the exceptions both for a search incident to lawful arrest and for one prompted by exigent circumstances creating a reasonable police concern for the likely imminent destruction of evidence. No Fourth Amendment violation occurred.

In the defendant's sole argument asserting an independent basis under the Search and Seizure Clause of the Indiana Constitution, Art. 1, § 11, he argues that his request for counsel, which occurred after he was in custody, precluded police from searching him. The defendant cites Pirtle v. State, 323 N.E.2d 634 (Ind. 1975), and Williams v. State, 611 N.E.2d 649 (Ind. Ct. App. 1993), *trans. denied*, for support. In Pirtle, this Court reversed a murder conviction in part because certain admitted evidence resulted from a warrantless search of the defendant's apartment after the defendant consented to the search while in custody. 323 N.E.2d at 639-40. We held that the defendant was "entitled to the presence and advice of counsel prior to making the decision whether to give such consent." *Id*. at 640; *see also* Sims v. State, 413 N.E.2d 556, 558-59 (Ind. 1980), *overruled in part on unrelated grounds by* Wright v. State, 658 N.E.2d 563, 570 (Ind. 1995).

In the present case, unlike Pirtle, the search by police was not based upon the defendant's consent. This is not a case where a defendant was precluded from an opportunity to consult with counsel before deciding whether to consent to the search. The defendant consented to nothing, and the police searched him incident to his lawful arrest and upon independent probable cause. We find no Pirtle violation.

We reject the defendant's claims that the admission of the evidence resulting from the search and seizure violated either the federal or state constitutions.

## 5. Admission of Photographs

The defendant contends that the trial court erred in admitting photographs of the victim, arguing that prejudice attributable to their gruesomeness substantially outweighed their probative value, that some photos were cumulative and duplicitous, and that some photos were taken after medical intervention to save the victim's life, or after autopsy.

The admission of photographs is reviewed on appeal for an abuse of discretion. Pruitt v. State, 834 N.E.2d 90, 117 (Ind. 2005), *cert. denied*, 548 U.S. 910, 126 S.Ct. 2936, 165 L.Ed.2d 962 (2006); Ealy v. State, 685 N.E.2d 1047, 1049-50 (Ind. 1997). No claimed error in admitting photographs is permitted "unless a substantial right of the party is affected." Ind. Evid. R. 103(a); *see* Pruitt, 834 N.E.2d at 117; Corbett v. State, 764 N.E.2d 622, 628 (Ind. 2002). "Whether an appellant's substantial rights are affected is determined by examining the 'probable impact of that evidence upon the jury.'" Pruitt, 834 N.E.2d at 117 (quoting Corbett, 764 N.E.2d at 628). Generally, photographs that depict a victim's injuries or demonstrate the testimony of a witness are inadmissible. Corbett, 764 N.E.2d at 627 (citing Fentress v. State, 702 N.E.2d 721 (Ind. 1998)); Ind. Evid. R. 401, 402. Though autopsy photographs have been found to be inadmissible to avoid the risk that the fact-finder could mistakenly infer that the defendant inflicted the autopsy incisions, Allen v. State, 686 N.E.2d 760, 776 (Ind. 1997), *cert. denied*, 525 U.S. 1073, 119 S.Ct. 807, 142 L.Ed.2d 667 (1999), exclusion of such photos is not necessary if they are accompanied by testimony to explain what had been done to the body, thus minimizing the potential for confusion and showing that the probative value outweighed the prejudicial effect, Corbett, 764 N.E.2d at 627 (citing Fentress, 702 N.E.2d at 722).

The defendant challenges the admission of four photographs—State's Exhibits 42, 44, 45, and 47—over his objections at trial.[17] State's Exhibit 42 shows a gaping wound to the victim's abdomen, with her internal organs visible. Apparent on the photograph are suture marks resulting from the effort to save the victim's life. The defendant contends that the wound may not have appeared so gruesome before medical intervention. Br. of Appellant at 82. State's Exhibit

---

[17] Although in his brief the defendant specifies six pictures to which he objected (State's Exhibits 42, 44, 45, 47, 48, and 77), he only fully develops arguments for State's Exhibits 42, 44, 45, and 47. State's Exhibit 48 depicts the upper portion of the victim's abdomen; State's Exhibit 77 depicts bloodstains on the floor of the victim's home.

13

44 shows the continuation of the abdominal wound around to the victim's back, and State's Exhibit 45 shows the same wound from a different angle. Again, the defendant objected on grounds that the photographs were gruesome and cumulative. State's Exhibit 47 shows the excised portion of the victim's spine, displaying marks left by a knife. The defendant also urges that this photograph possibly permitted the jury to hold the defendant responsible for the indignity of the autopsy. And the defendant further argues that these pictures lacked probative value because he had already pleaded guilty and, since guilt was not at issue in the penalty phase jury trial, were cumulative and used to inflame the jury.

As to his claim that two of the photographs (State's Exhibits 44 and 45) are cumulative to one another, we disagree. These photographs, showing the same abdominal laceration from two angles, had independent probative value in demonstrating the extent and severity of the injury.

Each of the four pictures is gruesome, but each was accompanied by the testimony of the forensic pathologist explaining the nature of the medical procedures performed on the victim and describing the relevance of each photograph. As in Fentress, this testimony served to mitigate the jury's drawing an impermissible inference that the defendant bore responsibility for the autopsy incisions. Further, notwithstanding the fact that guilt was established by the defendant's guilty pleas, these photographs remained probative and relevant to the mutilation and torture charged as aggravating circumstances. Proving the nature and extent of a gruesome crime usually requires gruesome evidence. The challenged photographs were relevant, and their probative value outweighed their potential prejudice. The trial court did not abuse its discretion by admitting these photographs into evidence.

**6. Appellate Review for Sentence Appropriateness**

The defendant seeks relief under Indiana Appellate Rule 7(B), urging that the death penalty is inappropriate in light of his character and the nature of the offense. In addition, the defendant incorporates into this argument unrelated claims, including assertions that the sentencing order was inadequate, that mitigating circumstances were not considered, that the torture and mutilation aggravator should have been dismissed as unconstitutionally overbroad, and that there

14

was insufficient evidence to support the jury's finding this aggravator. The appellate review authorized by Rule 7 allows revision of an otherwise proper sentence upon finding that the sentence is "inappropriate in light of the nature of the offense and the character of the offender." Ind. App. R. 7(B). But claims of trial court error associated with its sentencing decision are conceptually distinct claims and are not part of the appellate review-and-revise function. The defendant's ancillary claims are thus not encompassed in or relevant to his claim for appellate sentence review and revision under Rule 7(B), but we will nevertheless separately address each argument.

The defendant also includes a cursory assertion that "this Court is required at a minimum to consider whether a death sentenced appellant's sentence is erroneous." Br. of Appellant at 48 (citing Ind. Code § 35-50-2-9(j)(3)(B)). This statutory provision states that a death sentence "is subject to automatic review" by this Court pursuant to our rules and must take into consideration all claims that (1) the conviction or sentence violated the federal or state constitutions, (2) the sentencing court lacked jurisdiction to impose the sentence, and (3) the sentence "exceeds the maximum sentence authorized by law" or is otherwise erroneous. Ind. Code § 35-50-2-9(j). Our consideration of the issues presented in this appeal—including the defendant's ancillary claims, which arguably fall within claims of unconstitutionality under (1) and "otherwise erroneous" under (3)—satisfies the statutory requirement of review by this Court.

**(a) Adequacy of the Sentencing Order**

The defendant claims that the trial judge's sentencing statement fails to satisfy the specificity requirements of Harrison v. State. This regime applied to sentences of death and life without parole under the statutory framework existing before the substantial statutory changes in 2002. Prior law had placed final sentencing responsibility in the trial judge's hands, following receipt of the jury's advisory-only recommendation, which the judge was not obligated to follow. In contrast, the existing post-2002 procedure places the sentencing function with the jury. Now, after receiving the jury's sentencing recommendation, the trial judge is directed to "sentence the defendant accordingly." Ind. Code § 35-50-2-9(e). The trial judge is thus "obligated to follow the jury's recommendation" except in three situations not presented in this case. Pittman v. State, 885 N.E.2d 1246, 1253-54 (Ind. 2008). In cases operating under the post-2002 procedure,

"When a jury makes a final sentencing determination, a <u>Harrison</u>-style order would be out of place." *Id.* at 1254.

The new sentencing format established with the 2002 amendments to the death penalty statute apply to a conviction occurring after March 20, 2002, "entered as a result of a retrial of a person, regardless of when the offense occurred." P.L. 80-2002, § 2. The crime was committed on July 11, 2001; the initial guilt phase and penalty phase trials occurred in October 2002. Following reversal and remand and the defendant's guilty pleas, his penalty phase was retried beginning May 9, 2007, and he was sentenced on June 8, 2007. His penalty phase retrial and conviction are therefore governed by the post-2002 procedure.

We reject the defendant's claim that the trial court sentencing order was inadequate for failing to comport with the specificity requirements of <u>Harrison</u>.

**(b)  Trial Court Consideration of Mitigating Circumstances**

The defendant asserts that "the record indicates that the mitigating circumstances outlined above were not considered." Br. of Appellant at 55. His argument on this point consists of his summary of the evidence he claims proved that he suffered from exhibitionism and "the severe mental defect of psychopathogy," received poor discipline and training in his formative years, was immature and never self-sufficient, and could be safely housed in the prison system.

He argues in part that meaningful jury consideration of mitigation evidence is required by <u>Abdul-Kabir v. Quarterman</u>, 550 U.S. 233, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007). But <u>Quarterman</u> involved whether a jury was *impaired* from giving meaningful consideration to mitigation evidence; it did not involve an evaluation of whether a jury's mitigation consideration was sufficiently meaningful. At issue was whether the sentencing process was "fatally flawed" because the jury was "*not permitted* to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence—because it is forbidden from doing so by statute or a judicial interpretation of a statute." *Id.* at 264, 127 S.Ct. at 1675, 167 L.Ed.2d at 608 (emphasis added). The defendant here makes no claim that his penalty phase jury was forbidden by statute, judicial

16

interpretation, jury instruction, or from otherwise giving full meaningful consideration to his mitigation evidence, so <u>Abdul-Kabir</u> provides no recourse.

The methodology that the legislature adopted in 2002 entrusts to the jury the sentencing determination in cases involving death or life without parole.  As to its statutory role of determining whether aggravating circumstances outweigh mitigating circumstances (and the implicit necessary questions of whether and to what extent mitigating circumstances exist), this "is essentially a discretionary function as to which the jury has considerable leeway." <u>Pittman</u>, 885 N.E.2d at 1253.  "[T]he legislature intended to give the jury the final word in the trial court on sentencing under Indiana's death penalty statute." <u>Pruitt</u>, 834 N.E.2d at 121.  "Juries are traditionally not required to provide reasons for their determinations." <u>Pittman</u>, 885 N.E.2d at 1254. Here, the jury was extensively instructed regarding the nature of mitigating circumstances and their role in the jury's determination. *See, e.g.*, Final Instructions 14, 15, 18, 20, 23, Appellant's App'x at 1008, 1012, 1013, 1014.  The jury returned a unanimous verdict specifically finding "that any aggravating circumstance or circumstances that exist outweigh the mitigating circumstances herein."  Appellant's App'x at 1028.  We must assume that the jury considered the evidence presented in the trial.

In any event, given the confidentiality and finality of jury deliberations, the defendant's claim that his evidence of mitigating circumstances was "not considered" is virtually nonjusticiable.  We note, however, such evidence may be appropriately considered during our appellate review of sentence appropriateness in light of the nature of the offense the character of the offender, which the defendant has requested.

**(c)  Overbreadth of the Torture and Mutilation Aggravator**

The defendant contends that Indiana law is constitutionally deficient in failing to provide clear and objective standards and detailed guidance regarding the aggravating circumstance for mutilation or torture. The statute expresses this aggravating circumstance as follows: "The defendant burned, mutilated, or tortured the victim while the victim was alive."  Ind. Code § 35-50-2-9(b)(11).  In this case, the penalty phase jury was charged with determining whether the State

17

had proven beyond a reasonable doubt that the defendant "tortured the victim while the victim was still alive and/or the [d]efendant mutilated the victim while the victim was still live." Appellant's App'x at 1001.

We confronted a similar contention in Baird v. State, in which the defendant claimed that a multiple murder aggravator based on "knowing" murders fails to narrow the class of death eligible murders and was overbroad and vague. 604 N.E.2d 1170, 1183 (Ind. 1992), *cert. denied*, 510 U.S. 893, 114 S.Ct. 255, 126 L.Ed.2d 208 (1993). Remarking on the structure of our statutory death-penalty procedure, we held that it "adequately structures and channels the discretion of the jury and the court." *Id.* Rejecting the defendant's claim, we concluded that the legislative decision to designate the aggravator as indicative of appreciably greater culpability is neither arbitrary nor illogical. *Id.* at 1183-84. Our analysis in Baird applies equally to the challenged aggravators in this case.

The trial court instructed the jury as to the meaning of the terms "torture" and "mutilation":

> Torture is an appreciable period of pain or punishment intentionally inflicted and designed either to coerce the victim or for the torturer's sadistic indulgence. Put another way, torture is the gratuitous infliction of substantial pain or suffering in excess of that associated with the commission of the charged crime.

> Mutilation means to cut off or permanently destroy an essential part of a body or to cut up or alter radically so as to make imperfect. In order for mutilation to be found as an aggravating circumstance, there must be mutilation of the victim that goes beyond the act of killing.

Final Instructions No. 21 and 26, Appellant's App'x at 1004-05. The instruction defining "torture" is taken verbatim from this Court's definition in Leone v. State, 797 N.E.2d 743, 747 (Ind. 2003), and Nicholson v. State, 768 N.E.2d 443, 447 (Ind. 2002). The legislature's use of the term "mutiliation" is well understood without further explication. Neither "torture" nor "mutilation," particularly as defined for this jury, present any substantial risk that jurors will fail to apply a consistent standard in determining whether the defendant is death-penalty eligible.

**(d) Sufficiency of Evidence to Prove Torture and Mutilation**

The defendant contends that insufficient evidence supports the torture and mutilation aggravator. While acknowledging that he pleaded guilty to raping and murdering the victim, the defendant argues that no evidence showed that he tortured the victim to coerce sexual intercourse, that he intentionally inflicted an appreciable period of pain or punishment on her, or that her injuries went beyond those attendant to the act of killing.

We view the evidence differently and, indeed, find that the evidence of torture and mutilation was overwhelming. The victim's young sister, who called 911 during the attack, testified that she observed the defendant on top of the victim as the victim screamed and pleaded with the attacker to "please stop, please stop," to which he responded, "you better be quiet." Tr. at 1271. Law enforcement officers found the victim naked from the waist down, with her abdominal contents outside her body, flailing her arms and legs and trying to speak. The defendant had slashed the victim's throat, severing her windpipe and right internal jugular vein, and had cut open her abdomen with a twenty-four inch long slash around her waist. This wound exposed the victim's backbone. One doctor concluded from these injuries that the defendant had cut through the front of her abdomen and driven the knife all the way through her midsection and into her spine. The victim remained alive during this attack, during the on-the-scene EMT care, and during her transport to and care at the local hospital, where she squeezed the hand of an emergency room nurse when asked if she could understand. She was treated there for forty-six minutes and then air-lifted to the University of Louisville Hospital, where she was pronounced dead. The autopsy also revealed that she had sustained eighteen blunt force injuries and ligature marks on her left shin and right forearm.

In view of this evidence, a reasonable jury could find torture and mutilation beyond a reasonable doubt.

## (e) Appellate Review for Sentence Appropriateness

Invoking Appellate Rule 7, the defendant requests that we review and revise his death sentence. Emphasizing his belief that the mitigating circumstances were not considered in the

19

trial proceedings, the defendant argues that "[w]hen the aggravating circumstances are weighed against the mitigating circumstances, it is clear that [his] sentence should be less than death." Br. of Appellant at 55.

Appellate review under Rule 7, however, does not necessarily entail such a weighing of aggravating and mitigating circumstances. Rather, the rule generally directs that we evaluate whether the trial court sentence is inappropriate based on the nature of the offense and the character of the offender.[18] In this case, the nature of the offense is horrendous, as expressly acknowledged by the defense. Br. of Appellant at 54. The issue, then, is whether there is something about the defendant's character that persuades us to conclude that the death penalty is inappropriate. The defendant's only argument on this point is that we should favorably consider his evidence that he suffered from exhibitionism and "the severe mental defect of psychopathogy," received poor discipline and training in his formative years, was immature and never self-sufficient, and could be safely housed in the prison system. The defendant argues that his mental defect, which he asserts makes him incapable of emotions or pain, is genetic, not acquired through conscious choice, and that it results in impulsiveness which substantially impaired his ability conform his conduct to the law when he committed this murder.

In response, the State argues in part that the evidence undermines the reliability of the defense's expert opinion that the defendant suffered from psychopathy, the legitimacy and significance of psychopathy as a diagnosis, and the scientific reliability of the defense's claim that the defendant's alleged mental condition necessarily prevented him from controlling his behavior. Tr. 1958-61. Other experts did not reach the same diagnosis. The defendent's expert witness acknowledged that "psychopath" and "psychopathy" are listed as diagnoses in neither the DSM-IV nor in its subsequent revision. *Id.* at 1950-51. And the evidence revealed other instances in which the defendant was able to control his violent behavior.

Given these conflicting reports, the defendant's mental-health evidence is less than com-

---

[18] This rule permits a defendant to appeal his criminal sentence and authorizes the reviewing court to "revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. App. R. 7(B).

pelling. And his claims of parental inadequacies during his formative years are not particularly significant. *See* Ritchie, 809 N.E.2d at 274. These and his other arguments pale in the shadow of the nature of this offense. In Baer v. State, 866 N.E.2d 752 (Ind. 2007), *cert. denied*, ___ U.S. ___, 128 S.Ct. 1869, 170 L.Ed.2d 750 (2008), we rejected a defendant's request for appellate sentence revision, concluding:

> Giving due consideration to the trial court's decision, and in light of the nature of the offense shown by the defendant's brutal and savage slaying . . . , and the lack of demonstrated virtuous character in the defendant, we decline to intervene in the jury's determination that the death sentence is appropriate under the laws of Indiana for this defendant . . . .

*Id.* at 766. We conclude likewise in the present case.

**Conclusion**

We affirm the trial court's judgment ordering the death sentence for the defendant.

Sullivan, Boehm, and Rucker, JJ., concur. Shepard, C.J., concurs, continuing to believe that there is less justification for appellate alteration of sentence than there was when judges (rather than juries) were the final deciders of sentence. *See* Baer v. State, 866 N.E.2d 752, 766 (Ind. 2007) (Shepard, C.J., concurring).