FILED

Jan 17 2019, 9:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Ana M. Quirk
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Kelly A. Loy
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Danny L. Saintignon, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | January 17, 2019 <br><br> Court of Appeals Cause No. 18A-CR-279 <br><br> Appeal from the Delaware Circuit Court <br><br> The Honorable Linda R. Wolf, Judge <br><br> Trial Court Cause No. 18C03-1503-MR-1 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Danny Saintignon (Saintignon), appeals his conviction for conspiracy to commit burglary resulting in bodily injury, a Class A felony, Ind. Code §§ 35-43-2-1; 35-41-5-2; murder, I.C. § 35-42-1-1(1); and robbery resulting in bodily injury, a Class B felony, I.C. § 35-42-5-1(1).

We affirm.

# ISSUES

Saintignon presents five issues on appeal, which we consolidate and restate as the following three issues:

> (1) Whether the trial court abused its discretion or deprived Saintignon of a defense when it excluded certain witnesses;
>
> (2) Whether the trial court abused its discretion when it admitted certain photographic evidence; and
>
> (3) Whether the State produced sufficient evidence to prove beyond a reasonable doubt that Saintignon committed conspiracy to commit burglary resulting in bodily injury, murder, and robbery resulting in bodily injury.

# FACTS AND PROCEDURAL HISTORY

[4] On December 23, 2009, Saintignon telephoned his friend Tyler Barton (Barton) to enlist his help in robbing Monica Brown[1] (Brown), who lived in Muncie, Indiana, and sold prescription pain medication. Brown had recently been to Florida where she had purchased a large amount of medication. Saintignon had a sexual relationship with Brown, who at times supplied him with medication without charge. Brown usually kept her medication supply in her purse. Saintignon proposed to Barton that Saintignon would go to Brown's home, place her purse with the medication in it by the front door, and distract her with sex so that Barton could open the front door and grab the purse. Between 6:00 p.m. and 7:00 p.m. that day, Saintignon and Barton drove to Brown's house so that Barton would know where it was. They planned that Saintignon would contact Barton later, Barton would park around the corner from Brown's house, and Barton would wait for Saintignon to text him that it was time to grab the purse.

[5] The two split up. On December 24, 2009, Saintignon contacted Barton around 1:00 a.m. They drove separately to Brown's home, with Barton following Saintignon's car. Barton observed Saintignon's car stop at Brown's house. Barton drove on and parked around the corner in the pre-arranged spot. Barton waited for several hours for Saintignon to call or text him that it was time to

---

[1] Monica Brown is also referred to as "Nikki" in the record.

grab Brown's purse, but Saintignon never contacted him. Barton eventually left. As he drove away, he could see Saintignon's car still parked at Brown's house.

[6] Around 4:40 a.m., Barton received a frantic call from Saintignon that Barton had to meet him at Barton's father's house. When Barton arrived at his father's house, he noted that the back door had been kicked in. Saintignon was inside wearing nothing but his underwear. Barton thought that he saw a red speck on one of Saintignon's shoes. Saintignon told Barton that "I killed that bitch" by cutting her throat and stabbing her. (Transcript Vol. V, p. 162). Saintignon also told Barton that it had happened in a bedroom and that he had "cleaned it up like a professional." (Tr. Vol. V, p. 163). Saintignon had a dark-colored purse with him that had an emblem in the form of an initial on it. The purse contained prescription pain medication, some of which Saintignon shared with Barton. Barton could see that the purse also contained debit and food stamp cards. That morning, Saintignon called the automated account for Brown's Green Dot prepaid debit card and checked her balance.

[7] Saintignon put his clothes, his shoes, and the purse in a trash bag. Barton and Saintignon drove out into the country to find a place to burn the contents of the trash bag. Saintignon instructed Barton not to talk about what had happened and told him that if he were ever contacted by law enforcement, that he should say that Saintignon had been with him all that night playing video games because he was fighting with his wife. Barton's car blew a tire, and Saintignon contacted a friend to come and retrieve them. While they were waiting,

Brown's cell phone kept ringing, so Saintignon removed it from the trash bag and threw it from the car. Saintignon told Barton to burn the trash bag. Barton later went back to his disabled car, took the trash bag to his grandmother's, and hid it. Barton eventually threw the trash bag away.

[8] Around 11:00 a.m. on December 24, 2009, Brown's daughters, K.B. and S.B., ages seventeen and ten, respectively, went to Brown's home, where they found the front door unlocked, which was unusual. Upon entering, they found their younger brother running around the home and their younger sister in her play pen, unattended. They found Brown in a bedroom covered with a sheet. Her throat had been slit with a cut that reached to her fifth vertebrae. She had been stabbed and cut approximately eighty times, with ten of those stabs puncturing her lungs and liver.

[9] K.B., Brown's ex-husband, and others initially identified Cecil Ferguson[2] (Ferguson) as a suspect in Brown's killing. Ferguson was interviewed in the days following Brown's death but was eventually ruled out as a suspect due to the fact that none of his DNA was found at the crime scene, his phone records did not connect him to the killing, and witnesses vouched for his whereabouts. Starting the day after Brown's death, Saintignon contacted Brown's brother multiple times to ask him if he knew the whereabouts of the clip to Brown's .38 caliber handgun. Saintignon claimed to have purchased the gun from Brown.

---

[2] Cecil Ferguson is also referred to as "Eric" in the record.

During these conversations, Saintignon told Brown's brother that he was concerned that the authorities were monitoring his telephone calls. On December 26, 2009, Officer Melissa Pease (Officer Pease) of the Muncie Police Department (the MPD) interviewed Saintignon. She noted that he had bruising on his right bicep, scratches on his back, and a wound on his left palm. Officer Pease documented these injuries with photographs. Saintignon was questioned and released. The MPD conducted a number of interviews, executed searches of several homes, and collected DNA samples of Saintignon, Ferguson, and others, but no arrests were made. Several weeks after Brown's murder, Barton's father, Roy, confronted Saintignon about involving Barton in trouble. Saintignon told Roy that, "I killed the bitch." (Tr. Vol. 6, p. 158). Saintignon asked Roy if he thought Barton could be depended upon to uphold his alibi. Several months after Brown's murder, Saintignon told his wife, Sandrina, that he had slit Brown's throat because she had incriminating information about him.

[10] The case went cold until 2011, when Roy anonymously contacted the MPD to report that Saintignon had killed Brown. The tip led investigators to others who had information, including Sandrina. On March 18, 2014, Barton gave a statement to the MPD and was arrested on charges of conspiracy to commit burglary resulting in bodily injury, attempted burglary resulting in serious bodily injury, and assisting a criminal. On March 30, 2015, based on the new information received from Barton and others, the State filed an Information, charging Saintignon with conspiracy to commit burglary resulting in bodily

injury as a Class A felony; murder; felony murder; and robbery resulting in serious bodily injury as a Class A felony. The trial court set an omnibus date of May 21, 2015.

[11] By October of 2016, Barton had been released from jail pending resolution of his charges. On October 21, 2016, Barton received a direct message on a social media account from Jonathan Polosky (Polosky), who was unknown to Barton. Polosky wrote, "Hey, bro, you don't know me, this legal shit you've got going on needs to stop. You know what I'm talking about," which Barton took as a suggestion that he refrain from testifying against Saintignon. (Tr. Vol. V, pp. 186-87). Polosky also contacted Barton's then girlfriend, Kaylee Corn (Corn), with a message that her "old man" needed to "back away." (Tr. Vol. VI, p. 48). Barton and Corn reported the messages to the MPD, who used Barton's account to contact Polosky and ask him what he was talking about. Polosky responded, "[t]hat shit with [Saintignon]" and "[i]f this is who it should be, stay away from the courts." (Tr. Vol. VI, p. 62). On November 9, 2016, the MPD interviewed Polosky, who admitted that, while they were housed together at the Wabash Valley Correctional Facility, Saintignon had asked him to contact Barton and Corn to attempt to convince Barton not to testify against Saintignon.

[12] On November 16, 2016, the State filed an additional Information, charging Saintignon with conspiracy to commit obstruction of justice, a Level 6 felony. On August 16, 2017, the trial court issued an order directing the parties to file their final witness lists by September 1, 2017. On September 1, 2017,

Saintignon filed a motion *in limine* seeking to exclude evidence of any of his prior bad acts, including his membership in the Aryan Brotherhood. On September 5, 2017, the State filed its response indicating that it did not object to Saintignon's motion since it did not intend to introduce any such evidence. The trial court granted Saintignon's motion *in limine*. Saintignon's jury trial was scheduled to begin Monday, September 25, 2017.

[13] On Friday, September 22, 2017, Saintignon filed a notice to the trial court and an amended witness list indicating for the first time that the defense would call Jeff Burton (Burton) as an alibi witness. The State filed a motion to strike Saintignon's notice to the trial court on the grounds that it constituted an improper and untimely notice of alibi. At 10:41 p.m. on September 22, 2017, Saintignon filed a belated notice of alibi defense. The State also moved the trial court to strike that belated notice.

[14] Saintignon's jury trial took place from September 25, 2017, to October 10, 2017. On September 25, 2017, before the commencement of trial, the trial court held a hearing on the belated notice of alibi filings. The trial court granted the State's motion to strike the belated notice of alibi, excluding Saintignon's alibi witness. During the testimony of Officer Pease, the State sought to introduce the photographs she had taken of Saintignon when she interviewed him on December 24, 2009, documenting the injuries she observed on his bicep, back, and hand. The photograph showing the bicep injury was a frontal view of Saintignon nude from the waist up. Three of Saintignon's tattoos were fully visible, and three tattoos were partially visible in the photograph. The defense

objected on the basis that the photograph violated the trial court's Order *in Limine* excluding any evidence of Saintignon's affiliation with the Aryan Brotherhood. The trial court overruled Saintignon's objection and admitted the photograph into evidence.

[15] On October 4, 2017, the eighth day of trial, Saintignon sought to call Ferguson as a witness, but Ferguson invoked his Fifth Amendment right. The trial court found that Ferguson was unavailable to testify and held a hearing on evidentiary issues related to Ferguson, including the admissibility of statements by proposed witnesses Bradley Stone[3] (Stone), Johnny Hines, Jr., (Hines), and Robert Wine (Wine), all of whom Saintignon proposed would testify that Ferguson had confessed to killing Brown. In addition, Saintignon proposed that Tonya Ferguson (Tonya), Ferguson's ex-wife, would testify that Ferguson had once held knives to her throat and threatened to cut off her head. The trial court excluded Stone, Hines, and Wine as witnesses because their proposed statements were made at least three years after Brown's murder, were not unique or reliable, and had no "persuasive assurances of trustworthiness." (Tr. Vol. VIII, pp. 19-20). The trial court also excluded Tonya as a witness, finding that the acts she would relate took place months before Brown's murder and there was no evidence that Brown had been involved. However, the trial court ruled that evidence that Ferguson had robbed and threatened to kill Brown in

---

[3] Saintignon also refers to "Ralph Stone" in this portion of his argument, but there was no Ralph Stone proposed as a witness at trial. (Appellant's Br. p. 33).

the days before her murder and evidence that Brown had reported Ferguson's threats to police were admissible.

[16] On October 10, 2017, the jury found Saintignon guilty as charged. On January 10, 2018, the trial court conducted a sentencing hearing. Due to double jeopardy concerns, the trial court vacated Saintignon's felony murder conviction and entered judgment of conviction on the Class A felony robbery conviction as a Class B felony. The trial court entered judgment of conviction on Saintignon's conspiracy to commit burglary resulting in bodily injury, murder, and conspiracy to commit obstruction of justice convictions. The trial court then sentenced Saintignon to the Indiana Department of Correction for fifty years for the conspiracy to commit burglary resulting in bodily injury conviction, sixty-five years for the murder conviction, twenty years for the robbery resulting in bodily injury conviction, and two and one-half years for the conspiracy to commit obstruction of justice conviction. The trial court ordered Saintignon to serve all of his sentences consecutively, for an aggregate sentence of 137 and one-half years.

[17] Saintignon now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Exclusion of Witnesses*

[18] Saintignon argues that the trial court erred when it excluded some of his proposed witnesses, including his late-disclosed alibi witness, all of which he contends deprived him of a defense in derogation of his constitutional rights. A

trial court has inherent discretionary power regarding the admission of evidence, and we review its decisions only for an abuse of that discretion. *Vasquez v. State*, 868 N.E.2d 473, 476 (Ind. 2007). To reverse a trial court's decision to exclude evidence, there must be error by the court that affects the defendant's substantial rights. *Id.* In addition, the defense must have made an offer of proof, or the evidence must have been clear from the context. *Id.*

[19] Whether it is rooted directly in the Due Process Clause of the Fourteenth Amendment or the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense . . . This right is a fundamental element of due process of law." *Kubsch v. State*, 784 N.E.2d 905, 924 (Ind. 2003) (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)). However, although this right is fundamental and of the utmost importance, it is not absolute. *Marley v. State*, 747 N.E.2d 1123, 1132 (Ind. 2001). "[T]he accused, as is required by the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.* (*quoting Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).

### A. *Evidence Ferguson Threatened his Ex-wife*

[20] After Ferguson was declared unavailable as a witness, Saintignon sought to have Tonya testify that she had procured a protective order against Ferguson

because he had once held knives to her throat and threatened to decapitate her. The trial court excluded this testimony based on its lack of relevance because the events happened months before Brown's killing and did not involve Brown. Saintignon claims this was an abuse of the trial court's discretion. However, apart from this bald assertion of trial court error, Saintignon offers no further argument for the admissibility of Tonya's testimony, and so he has failed to persuade us that the trial court erred, let alone committed reversible error, when it excluded Tonya's testimony. *Vasquez*, 868 N.E.2d at 476.

[21] In addition, Indiana Evidence Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tonya's testimony was offered to show that it was Ferguson, not Saintignon, who killed Brown. We agree with the State that Tonya's testimony is the very type of evidence that Indiana Evidence Rule 404(b) is meant to exclude. Saintignon had a right to present a defense, but that defense was still required to comport with the rules of evidence. *Marley*, 747 N.E.2d at 1132. Because this proffered testimony was irrelevant and inadmissible as character evidence, we conclude that the trial court did not abuse its discretion in excluding it, nor was Saintignon impermissibly deprived of a defense thereby.

## B. *Third-Party Confessions*

[22]    Saintignon next argues that the trial court erred and he was deprived of a defense when the trial court excluded his proposed witnesses Stone and Hines[4], both of whom he contends would have testified that Ferguson had confessed to killing Brown.  Our Supreme Court has held that the exclusion of third-party confessions may constitute a reversible due process violation if the hearsay statements are characterized by "persuasive assurances of trustworthiness." *Chambers*, 410 U.S. at 300-02.  The facts of *Chambers* are as follows:

> [A] murder occurred during a barroom brawl.  Four months afterward, Gable McDonald swore in writing that he was the shooter, but he later repudiated his confession.  Three of McDonald's acquaintances were prepared to testify that he orally confessed to them on separate occasions.

> At trial, Chambers' lawyer called McDonald and introduced the written confession into evidence.  The State then elicited testimony about the repudiation, plus a fresh denial by McDonald.  Chambers was denied permission to cross-examine McDonald as an adverse witness based on Mississippi's "voucher" rule.  He was also denied the opportunity to introduce testimony by the three other witnesses to whom McDonald confessed.

---

[4]  Saintignon lists "Robert Wine" as one of the witnesses who he contends the trial court erred in excluding, but he does not develop any further argument on this witness.  Saintignon has waived any argument pertaining to Robert Wine for failing to provide a cogent argument supported by citations to the record and authority.  *See* Ind. Appellate Rule 46(A)(8)(a).

*Giffin v. State*, 763 N.E.2d 450, 451 (Ind. 2002) (citations omitted). The Supreme Court held that, under the specific facts and circumstances of Chambers' case, "the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him . . . due process. *Chambers*, 410 U.S. at 302-03. The Court emphasized the "persuasive assurances of trustworthiness" of the third-party-confession hearsay statements in that the three confessions were made spontaneously to close acquaintances shortly after the murder; other corroborating evidence existed; the statements were against interest; and McDonald was available at trial. *Id.* at 300-02.

[23] Putting aside the State's contention that Saintignon failed to make an adequate offer of proof to preserve this issue, we find that Saintignon utterly failed to demonstrate on appeal that Stone's and Hines' testimony would have borne persuasive assurances of trustworthiness such as those at issue in *Chambers*. His argument on this issue consists almost entirely of a statement regarding what Stone and Hines would have said had they been allowed to testify. He also briefly contends, without citation to authority, that the trial court erred when it excluded Stone's and Hines' testimony because their statements were made at least three years after Brown was murdered, whereas it had admitted evidence of his guilt generated a substantial period of time after Brown's murder. However, in light of *Chambers*, the trial court properly considered the remoteness of the proposed statements to the murder when deciding whether the statements were admissible.

In addition, the trial court did allow Saintignon to present evidence that Ferguson had lived with Brown at times in the past until they had a falling out, Ferguson had threatened to slit Brown's throat just days before she was murdered, he had left a message on Brown's voicemail that he would kill her in front of her children, Brown had reported those threats to police the day before she was found dead, and that at least five people had initially identified him as a suspect in Brown's murder. As such, Saintignon has failed to persuade us that the trial court erred when it excluded the testimony of Stone and Hines or that he was unconstitutionally deprived of a defense thereby.

## C. *Belated Notice of Alibi*

The trial court also excluded Saintignon's late-disclosed alibi witness, Burton, which Saintignon argues was an error that deprived him of a defense. Notices of alibi defense are governed by Indiana Code section 35-36-4-1, which requires that such notices be filed no later than twenty days prior to the omnibus date for a felony charge and that the defendant serve a notice upon the prosecutor which "must include specific information concerning the exact place where the defendant claims to have been on the date stated in the indictment or information." If the defendant does not comply with the statutory requirements, and the defendant does not show good cause for his failure to do so, the trial court "shall exclude evidence offered by the defendant to establish an alibi." I.C. 35-36-4-3(b). What constitutes "good cause" for a late filing is left to the discretion of the trial court. *Washington v. State*, 840 N.E.2d 873, 880 (Ind. Ct. App. 2006), *trans. denied*.

[26] Saintignon does not contend on appeal that his notice was timely, but, rather, contends that he showed good cause existed for his late filing. Saintignon argues there was no evidence that he purposefully suppressed his alibi evidence because he was not charged with Brown's murder until 2015 and he had been ingesting pain pills at the time of Brown's murder which prevented him from remembering. Saintignon also contends that the State was not unduly prejudiced because it could have interviewed his late-disclosed alibi witness, as he was located in the Delaware County Jail.

[27] Saintignon's belated notice of alibi provided that "The Defendant states that he was at the residence of Jeff Burton for a significant portion of the night of December 23, and early morning of December 24, 2009." (Appellant's App. Vol. III, p. 76). Saintignon provided a summary of Burton's statement to the State, but a copy of that summary is not part of the record on appeal. However, at the hearing on the State's motion to strike Saintignon's belated notice of alibi, the prosecutor read from the summary of Burton's statement as follows:

> [O]n September 21st, 2017, *while meeting with the Defendant*, counsel for Defendant, Jill Gonzalez, was made aware that Jeff Burton possibly had information concerning State of Indiana v. Danny Saintignon. Specifically, that the Defendant was at Mr. Burton's house, late on December 23rd, 2009, until 2:00 to 4:00 a.m. on December 24th, 2009.

(Tr. Vol. II, p. 7) (emphasis added).

[28] Saintignon's counsel represented to the trial court that she had become aware of Burton as a possible alibi witness through jailhouse rumors first heard on

Thursday, September 21, 2017. Saintignon's counsel did not identify the source of those rumors. Thus, it appears that Saintignon himself was the source of the information about Burton. The trial court excluded Burton as a witness because the notice of alibi was not timely, the case had been pending since March 20, 2015, and Saintignon's whereabouts were a matter that was within his own personal knowledge that could have been discerned within that time. The trial court was not required to credit Saintignon's self-serving explanation that drug use prevented him from remembering Burton as an alibi witness until days before his trial was to begin. Saintignon has not provided us with any legal authority holding that a trial court abused its discretion in excluding a third-party alibi witness under like circumstances, and we are aware of none. Because we cannot conclude that the trial court abused its discretion given the circumstances of this case, we affirm its exclusionary ruling.

[29] To the extent that Saintignon argues that he was deprived of a defense, "we must balance [a defendant's] right to present witnesses on his behalf against the State and the public's interest in maintaining the integrity of the adversary process." *Washington*, 840 N.E.2d at 883. When a defendant willfully or purposefully suppresses alibi evidence to gain a tactical advantage, the trial court may properly exclude the proffered alibi defense without violating the defendant's constitutional right to present a defense. *Id*.

[30] Here, Saintignon's explanation for not knowing about Burton as an alibi witness until just days before his trial was to begin was that he was using drugs at the time of Brown's murder which prevented him from remembering. This

self-serving explanation, proffered through Saintignon's counsel, does not enjoy any support in the record. In addition, Saintignon was interviewed by law enforcement on December 26, 2009, December 4, 2014, and March 30, 2015, and had presumably met with his defense counsel multiple times before trial, yet he never remembered on any of those occasions where he had been during the period in question. Indeed, given that the information regarding Burton came from Saintignon himself, this would seem to be the very sort of willful or purposeful suppression of alibi evidence which a trial court may properly exclude. *Id.*

[31] In addition, the information provided in Saintignon's notice of alibi was vague about the time he was allegedly at Burton's home, and the portion of the summary of Burton's statement read into the record only covered a period of time from 2:00 a.m. and 4:00 a.m. Given the fact that there was evidence in the record that Saintignon was still in the area of Brown's home after 4:00 a.m., we are unable to discern whether Burton's testimony would have been truly exculpatory. Finding no abuse of discretion on the part of the trial court and that Saintignon was not impermissibly deprived of a defense by the exclusion of Burton's testimony, we uphold the trial court's evidentiary ruling.

## II. *Photograph Depicting Tattoos*

[32]    Next, Saintignon contends that the trial court erred when it admitted a photograph[5] into evidence that showed what he contends were his Aryan Brotherhood tattoos because the probative value of the photograph was "substantially outweighed" by the prejudicial effect of the photograph on the jury. (Appellant's Br. p. 35). We review a trial court's decision to admit photographic evidence for an abuse of discretion. *Ward v. State*, 903 N.E.2d 946, 958 (Ind. 2009). No claim of error in the admission of photographs is permitted unless a substantial right of the party is affected. *Id*.; Ind. Evidence Rule 103(a). "Whether an appellant's substantial rights are affected is determined by examining the probable impact of that evidence upon the jury." *Ward*, 903 N.E.2d at 958.

[33]    Relevant evidence is "evidence having the tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Evid. R. 401. As a general rule, relevant evidence is admissible, and irrelevant evidence is inadmissible. *Southern v. State*, 878 N.E.2d 315, 321 (Ind. Ct. App. 2007), *trans. denied*. However, even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Evid. R. 403.

---

[5] Saintignon refers to "photographs" in his Appellant's Brief, but only one photograph of his torso showing his tattoos was admitted into evidence, Exhibit 79. (Appellant's Br. p. 35).

[34] Here, the State had agreed prior to trial that it would not seek to admit evidence of Saintignon's membership in the Aryan Brotherhood. The State offered Exhibit 79 to show that Saintignon had a bruise on his right bicep two days after Brown was murdered. Such an injury could tend to make it more probable that he was Brown's killer, and, thus, it was relevant to an issue at trial. The State did not present any testimony identifying or explaining the significance of Saintignon's tattoos, only three of which are fully visible in the photograph. Because none of the tattoos clearly denote the Aryan Brotherhood, we find that the minimal, if any, prejudice to Saintignon did not render the photograph inadmissible and that the impact on the jury, if any, did not affect his substantial rights. *Ward*, 903 N.E.2d at 958. As such, we conclude that the trial court did not abuse its discretion when it admitted the challenged photograph.[6]

### III. *Sufficiency of the Evidence*

[35] Saintignon challenges the evidence supporting his convictions for conspiracy to commit burglary resulting in bodily injury, murder, and robbery resulting in bodily injury. When we review the sufficiency of the evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). It is not

---

[6] Saintignon also makes a three-sentence argument regarding the admission of evidence that he was serving time in jail. Saintignon refers to "various letters and conversations" but makes no further effort to identify specific pieces of evidence which he contends were erroneously admitted. (Appellant's Br. p. 35). Saintignon has waived this argument by failing to provide adequate citation to the record. *See* App. R. 46(A)(8)(a).

our role as an appellate court to assess witness credibility or to weigh the evidence. *Id.* We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.*

### A. *Conspiracy to Commit Burglary Resulting in Bodily Injury*

[36] The State charged Saintignon with conspiracy to commit burglary resulting in bodily injury in relevant part as follows:

> [Saintignon] did, with intent to commit the crime of Burglary, agree with another person or persons to commit said crime of Burglary and in furtherance of said agreement, [Barton], [Saintignon] or other unnamed person or persons did commit one or more of the following overt acts: 1) Obtained or retained a cellular phone 2) Traveled to the area of [Brown's home] for the purpose of committing Burglary 3) Traveled to [Brown's home] for the purpose of committing Burglary 4) Entered [Brown's residence] for the purpose of committing Burglary[.]

(Appellant's App. Vol. II, p. 50). The offense of burglary occurs when a person breaks and enters the building or structure of another person with intent to commit a felony. I.C. § 35-43-2-1. In order to convict for a conspiracy crime, the State must allege and prove that either the person or the person with whom he agreed to commit a felony performed an overt act in furtherance of the agreement. I.C. § 35-41-5-2(b). It is not necessary to establish the offense of conspiracy that the underlying felony actually be committed or even attempted. *Hammond v. State*, 594 N.E.2d 509, 515 (Ind. Ct. App. 1992), *trans. denied.*

[37] Here, Barton testified that Saintignon contacted him on December 23, 2009, with a plan to rob Brown of her prescription pain medication. Saintignon and

Barton agreed that Saintignon would go to Brown's home, place her purse containing the medication by the front door, and distract her with sex so that Barton could open the front door and grab the purse. In furtherance of that plan, Saintignon and Barton went to the area of Brown's home in the evening of December 23, 2009, to show Barton where Brown's home was located and to decide where Barton should park his car and wait for the signal to open Brown's front door and grab the purse. Early in the morning of December 24, 2009, Barton followed Saintignon's car to Brown's house, where Saintignon parked. Barton went around the corner and parked in the spot where they had previously agreed. This evidence supports the jury's reasonable conclusion that Saintignon and Barton agreed to commit a burglary against Brown and performed at least two of the acts alleged by the State in furtherance of that agreement, namely traveling to the area of Brown's home to case it and traveling to Brown's home to commit the burglary.

[38] Saintignon's challenge to this conviction is that there was no evidence that he texted Barton to grab the purse, went into Brown's home, there was a breaking and entry, or that they had obtained cell phones to use in the burglary. These arguments are unavailing because it is not necessary for the State to prove that Saintignon actually accomplished the burglary in order to prove the offense. *Hammond*, 594 N.E.2d at 515. Inasmuch as Saintignon argues that there was no plan to break and enter Brown's home as part of the burglary plot, we note that Barton's planned entry through Brown's unlocked front door to grab her purse would have been sufficient to fulfill the element of breaking and entering

for burglary. *See Davis v. State*, 770 N.E.2d 319, 322 (Ind. 2002) (noting that opening an unlocked door constitutes a breaking for purposes of burglary). The fact that the State may not have proved that they obtained cell phones to use in the burglary does not represent a deficiency in the evidence, as the State proved two other overt acts in furtherance of the conspiracy. Concluding that the State proved beyond a reasonable doubt that Saintignon conspired to commit a burglary resulting in bodily injury, we affirm his conviction.

### B. *Murder*

[39] Saintignon argues that the State did not prove that it was he who killed Brown. Murder is the knowing or intentional killing of another human being. I.C. § 35-42-1-1(1). A defendant's murder conviction may be sustained on circumstantial evidence alone. *Sallee v. State*, 51 N.E.3d 130, 134 (Ind. 2016); *Jones v. State*, 780 N.E.2d 373, 376 (Ind. 2002).

[40] Here, Saintignon confessed to Barton just hours after her death that he had murdered Brown and had cleaned it up like a professional. This was direct evidence of Saintignon's guilt which sustains his conviction. *See Sallee*, 51 N.E.3d at 134-35 (noting that a murder conviction can be sustained on the testimony of a single witness, even where the evidence is uncorroborated). Nevertheless, there was evidence in the record that Saintignon also confessed to Sandrina and Roy on separate occasions. These confessions were corroborated by evidence that Saintignon texted and called Brown throughout the evening of December 23 and December 24, 2009; Barton observed Saintignon's car parked at Brown's home for a significant period of time hours before Brown was

discovered dead; cell phone tower records showed that Saintignon was in the vicinity of Brown's home in the early morning hours of December 24, 2009; Saintignon was frantic and upset when Barton encountered him around 5:00 a.m. and confessed to killing Brown; the crime scene had been wiped down, largely removing DNA and fingerprint evidence; Saintignon attempted to destroy his clothing and Brown's purse linking him to the murder; Saintignon had a visible wound on his hand the same morning Brown was discovered dead; and Saintignon had no alibi.

[41] Nevertheless, Saintignon draws our attention to the relative dearth of DNA, blood, and fingerprint evidence connecting him to the crime scene, Barton's admission that he did not actually observe Saintignon enter Brown's home, and his alternate explanation for the wound Officer Pease observed on his hand. These arguments are unavailing given our standard of review, which mandates that we neither reweigh the evidence nor reassess the credibility of witnesses. *Drane*, 867 N.E.2d at 146. Concluding that the State proved beyond a reasonable doubt that it was Saintignon who killed Brown, we affirm his conviction for murder.

### C. *Robbery Resulting in Bodily Injury*

[42] Saintignon also briefly argues that the State failed to prove that he committed a robbery resulting in bodily injury. The State charged Saintignon with robbery, in relevant part, as follows:

[Saintignon] did knowingly take property from . . . Monica Brown, by using force or by threatening the use of force, said act resulting in [] bodily injury to Monica Brown.

(Appellant's App. Vol. II, p. 53). The offense of robbery may be proven by circumstantial evidence. *See, e.g., Beasley v. State*, 445 N.E.2d 1372, 1373-74 (Ind. 1983) (sustaining a robbery conviction based on circumstantial evidence).

[43] Saintignon's challenge to the evidence supporting his conviction for robbery is that the State failed to prove that there was property missing from Brown's house, that he took Brown's property, or that he was in possession of Brown's property. However, Brown's daughter, K.B. testified that Brown kept her medication in a black purse with a "Chanel symbol" on it. (Tr. Vol. III, p. 70). K.B. also verified that Brown had a Green Dot card which she kept in her wallet in her purse. Brown's brother testified that Brown possessed a .38 caliber handgun which she sometimes kept in her purse. However, none of these items were found in Brown's home after she was killed.

[44] Barton and Saintignon had planned to rob Brown. Barton testified that when he met with the frantic Saintignon around 5:00 a.m. the morning of December 24, 2009, Saintignon was in possession of a dark colored purse that had an emblem in the form of an initial on it and that the purse contained pain pills. There was evidence in the record that Brown never left the house without her purse and that Saintignon wanted to burn the purse he had that morning, all of which supports a reasonable inference that he possessed Brown's purse and that his possession of the purse was not legitimate. Saintignon was also in

possession of Brown's Green Dot prepaid debit card which Brown kept in her wallet in her purse, which was further evidence that the purse Barton saw Saintignon with the morning of December 24, 2009, was Brown's. In addition, after Brown's killing, Saintignon was in possession of Brown's .38 caliber handgun and contacted her brother the day after Brown's murder to attempt to procure the gun's clip. When speaking with Brown's brother, Saintignon cautioned Brown's brother that the authorities may be monitoring his calls, which supports a reasonable inference that Saintignon knew that his possession of Brown's gun was not legitimate either. We conclude that this evidence supports reasonable inferences that there was property missing from Brown's house, that Saintignon took Brown's property, and that Saintignon was in possession of Brown's property after her murder. As such, we affirm Saintignon's conviction for robbery resulting in bodily injury.

## CONCLUSION

Based on the foregoing, we conclude that the trial court did not abuse its discretion when it excluded Saintignon's proposed witnesses, nor did it deprive him of his right to present a defense. In addition, we conclude that the trial court did not abuse its discretion when it admitted a photograph that depicted Saintignon's tattoos. Lastly, we conclude that the State proved beyond a reasonable doubt that Saintignon committed the offenses of conspiracy to commit burglary resulting in bodily injury, murder, and robbery resulting in bodily injury.

Affirmed.

Kirsch, J. and Robb, J. concur